## HOADLEY'S ADMINISTRATORS *v.* SAN FRANCISCO.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

Submitted December 8, 1887. — Decided February 20, 1888.

When a cause is brought here by writ of error to a state court, on the ground that the obligation of a contract has been impaired and property taken for public use without due compensation, in violation of the provisions of the Constitution of the United States, the first duty of this court is to inquire whether the alleged contract or taking of property exists; and the facts in this record disclose no trace of the alleged contract or the alleged taking of property.

OCTOBER TERM, 1887.

The act of Congress of July 1, 1864, 13 Stat. 332, c. 194, taken in connection
with the ordinances of the city of San Francisco and the act of the legis-
lature of California which it refers to, operated to convey to the city
the land occupied by the squares known as "Alta Plaza" and "Hamil-
ton Square" for the uses and purposes specified in the ordinances, and
to dedicate the tracts to public use as squares, and made it unlawful for
the city to convey the same to any private parties; and the conveyance
did not in any way inure to the benefit of the plaintiff in error.

THIS suit was brought by Milo Hoadley to quiet his title to
certain lands in the city of San Francisco. The material facts
were these:

Prior to 1848 there existed at the place now occupied by
the city of San Francisco a town or pueblo, which was organ-
ized under the Mexican government, and which claimed title
to four square leagues of land, including the premises in con-
troversy. The present city of San Francisco is the legal suc-
cessor of this town or pueblo. In the spring of 1850 Hoadley
entered into the possession of a part of the claim, including the
land now in dispute. The city of San Francisco was incor-
porated by the State of California, April 15, 1851, and, on the
6th of July, 1852, it presented to the board of land commis-
sioners, organized under the act of Congress of March 3, 1851,
9 Stat. 631, c. 41, "to ascertain and settle the private land
claims in the State of California," its claim, as the successor
of the pueblo, to the four leagues of land held, as alleged, by
the pueblo under Mexican authority. The commission, in
December, 1854, confirmed the claim to only a portion of the
four leagues, *Trenouth* v. *San Francisco*, 100 U. S. 251, 253,
and the city took an appeal to the District Court.

On the 20th of June, 1855, while this appeal was pending
and undisposed of, the common council of the city passed ordi-
nance No. 822, commonly called the Van Ness ordinance,
"for the settlement and quieting of the land titles in the city
of San Francisco." By the first section it was made the duty
of the mayor to enter at the proper land office at the minimum
price all the lands within the city above the natural high-water
mark of the Bay of San Francisco "in trust for the several
use, benefit, and behoof of the occupants or possessors thereof,
according to their respective interests." The second section re-

linquished and granted all the right and claim of the city to the lands within the corporate limits to the parties in the actual possession thereof, with certain exceptions not material to this case. The third section provided that the patent issued or any grant made by the United States to the city should inure to possessors "as fully and effectually, to all intents and purposes, as if it were issued or made directly to them individually and by name." Sections 6, 8, and 10 of the same ordinance were as follows:

"SEC. 6. The city . . . may lay out and reserve upon the said lands . . public squares, which shall not embrace more than one block, corresponding in size to the adjoining block: *Provided,* That the selection shall be made within six months from the time of the passage of this ordinance; and that the city shall not, without due compensation, occupy, for the purposes mentioned in this section, after the laying out the streets aforesaid, more than one-twentieth part of the land in the possession of any one person."

"SEC. 8. The selection of said lands and lots shall be made by a commission, to consist of three persons, who shall be chosen by the common council, in joint convention, who shall report the same to the common council for its approval; and, upon such approval, deeds of release to the corporation for the lands thus selected shall be executed, acknowledged, and recorded, in which deeds shall be specified the uses for which they are granted, reserved, and set apart respectively."

"SEC. 10. Application shall be made to the legislature to confirm and ratify this ordinance, and to Congress to relinquish all the right and title of the United States to the said lands for the uses and purposes hereinbefore specified."

No entry of the land was ever perfected under this or any other ordinance. Neither was there any selection of squares made before the 27th of September, 1855, when the common council passed ordinance No. 845, being an "ordinance providing for, selecting, and designating public squares, . . . according to the provisions of ordinance No. 822," and confirmatory thereof. This ordinance provided for the election of three commissioners to act under No. 822, and to discharge

the duties specified in § 8 thereof.    Under this ordinance commissioners were chosen, and, by another ordinance, passed April 7, 1856, they "were granted until the 20th day of April, 1856, to complete their labors." ᐧ On the 19th of April, 1856, these commissioners made their report, by which they laid out and reserved, among others, " Alta Plaza " and " Hamilton Square," and, in so doing, they took for each four blocks instead of one, and they also took more than one-tenth of the whole land in the possession of Hoadley. No compensation has been made him for any part of the land so taken.

On the 15th of October, 1856, this taking and these reservations were approved by an order of the board of supervisors of the city and county of San Francisco, then the governing body of the city.    On the 11th of March, 1858, the legislature of California passed an act, Session Laws 1858, 52, c. 66, embodying and reciting literally the two ordinances of the common council and the order of the board of supervisors above mentioned, and then enacted as follows:

" Be it therefore enacted, That the within and before recited order and ordinances be, and the same are hereby, ratified and confirmed ; and all the land entered, or to be entered, in the United States Land Office, in pursuance of section one of the first recited of said ordinances, in trust, shall pass and inure to and be deemed to have immediately vested in the occupants thereof, for their several use and benefit, according to their respective interests, in execution of the trust designated in an act of Congress entitled ' An act for the relief of citizens of towns upon the public lands of the United States under certain circumstances,' approved May twenty-third, one thousand eight hundred and forty-four, as extended and applied by an act of Congress entitled ' An act to provide for the survey of the public lands in California, the granting of preëmption rights therein, and for other purposes,' approved March third, one thousand eight hundred and fifty-three ; and it shall be the duty of all courts and officers to take judicial notice of the said order and ordinances, as hereinbefore recited, without further proof, as fully and effectually to all intents and purposes as if they were public acts of the state legislature.

" Sec. 2. That the grant or relinquishment of title made by the said city in favor of the several possessors by sections two and three of the ordinance first above recited shall take effect as fully and completely, for the purpose of transferring the city's interest, and for all other purposes whatsoever, as if deeds of release and quitclaim had been duly executed and delivered to and in favor of them individually and by name; and no further conveyance or other act shall be necessary to invest the said possessors with all the interest, title, rights, benefits, and advantages which the said order and ordinances intend or purport to transfer or convey, according to the true intent and meaning thereof : *Provided,* That nothing in this act shall be so construed as to release the city of San Francisco, or city and county of San Francisco, from the payment of any claim or claims due or to become due this State against said city, or city and county, nor to effect or release to said city and county any title this State has or may have to any lands in said city and county of San Francisco."

By § 5 of the act of July 1, 1864, 13 Stat. 332, c. 194, " to expedite the settlement of titles to lands in the State of California," Congress enacted as follows :

" Sec. 5. *And be it further enacted,* That all the right and title of the United States to the lands within the corporate limits of the city of San Francisco, as defined in the act incorporating said city, passed by the legislature of the State of California on the fifteenth of April, one thousand eight hundred and fifty-one, are hereby relinquished and granted to the said city and its successors, for the uses and purposes specified in the ordinances of said city, ratified by an act of the legislature of the said State, approved on the eleventh of March, eighteen hundred and fifty-eight, entitled ' An act concerning the city of San Francisco, and to ratify and confirm certain ordinances of the common council of the city.' "

Under the authority of the same statute, § 4, the appeal of the city of San Francisco then pending in the District Court was transferred to the Circuit Court, and that court on the 18th of May, 1865, entered a decree confirming the claim so as to include the land now in dispute, but declaring that " this

confirmation is in trust for the benefit of the lot-holders under grants from the pueblo, town, or city of San Francisco, or other competent authority ; and as to any residue, in trust for the use and benefit of the inhabitants of the city."

Upon these facts Hoadley claimed title to the parts of the "Alta Plaza" and "Hamilton Square," which were taken from the lands originally occupied by him under his entry in 1850. The Supreme Court of the State decided that the title was in the city, and enjoined him from "meddling or interfering with the same." 70 California, 320. To reverse that judgment this writ of error was brought.

*Mr. S. W. Holladay* for plaintiffs in error. *Mr. John Currey* and *Mr. W. C. Belcher* were with him on the brief.

*Mr. George Flournoy, Sr., Mr. George Flournoy, Jr.,* and *Mr. John B. Mhoon* for defendant in error.

MR. CHIEF JUSTICE WAITE, after stating the case, delivered the opinion of the court.

This case was before us at October term, 1876, upon an appeal from an order of the Circuit Court of the United States remanding it to the state court from which it had been removed under the act of March 3, 1875, 18 Stat. 470, c. 137. We then said that "the questions involved did not arise under the laws of the United States, but under the ordinances of the city as ratified by the act of the legislature. The act of Congress operated as a release to the city of all the interests of the United States in the land. The title of the United States was vested in the city. Whether the city took the beneficial interest in the property as well as the legal title depended upon the effect to be given to the act of the legislature and the ordinances, and not upon the act of Congress." For this reason we affirmed the order remanding the case which had been removed upon a petition "alleging that it was one arising under the Constitution and laws of the United States." *Hoadley v. San Francisco,* 94 U. S. 4.

The record in that case presented all the questions which

arise in this except one which is thus stated in the specification of error found in the brief of counsel for Hoadley:

"It was error for the court to decide that that part of the act of March 11, 1858, was valid which ratified the order of the board of supervisors of October 16, 1856, adopting the plan or map of the city 'in respect to the reservation of squares for public purposes,' and thereby deciding that plaintiff has no title, thus impairing the obligation of the contract of grant, in ordinance 822, in violation of Article 1, § 10, of the Constitution of the United States.

"It was error, because, under said decision, that part of the act of 1858 took plaintiff's property without due process of law, and without just compensation, in violation of the Fifth Amendment of the Constitution of the United States."

This makes it necessary to inquire whether ordinance 822 contains any contract with Hoadley, the obligation of which was impaired by the act of March 11, 1858, or whether it vested in him any property which would be taken away without due process of law if the statute is adjudged to be valid. In the consideration of federal questions of the character presented by this specification of error our first duty is to determine whether there is such a contract, or such right of property as is alleged. The existence of the contract or of the right is part of the federal question itself. *The Bridge Proprietors* v. *The Hoboken Company*, 1 Wall. 116, 145.

As to this branch of the case the record shows that the Supreme Court of California said in its opinion:

"Whatever rights the plaintiff acquired under the Van Ness ordinance he took subject to the act of 1858, which approved the survey and map above mentioned. This is true under any proper application of the doctrine of relation invoked on behalf of plaintiff. The act of approval ratified the ordinance 822 allowing title to be made under it by a possession designated in it, and ratified also ordinance 845 and the order of the justices approving the survey and map above mentioned; and when the act of 1858 was passed, the doctrine of relation could vest in the plaintiff no greater rights than he took under the act of 1858. Any rights which plaintiff derived under

the act of 1858 would be subject to all its provisions.   At the same time that ordinance 822 was ratified the order approving the map and survey above mentioned was also ratified, and whatever rights plaintiff took under the act were subject to the provisions of the ordinance and order so ratified.   We find in the case no trace of a contract between the plaintiff and any one which ever vested in plaintiff any rights different from those accorded to him herein."   70 California, 325.

To this we agree.   When the ordinance was passed the title of the city to the property covered by the claim then pending before the District Court on appeal was imperfect.   It never did acquire title by entry as contemplated in the first section, and that further action was required both by the legislature of California and by Congress before occupants could secure title under the grants contemplated in § 2, is clearly shown by § 10, which specially provides for application to the legislature to confirm and ratify the ordinance, and to Congress to relinquish the title of the United States.   The ordinance granted only such title as the city was permitted by Congress and the State to convey.   In its legal effect the act of Congress conveyed the lands to the city for the uses and purposes specified in the ordinances and the order of the city ratified by the act of the legislature.   In this way the two squares, as designated in the report of the commissioners, approved by the order of October, 1856, were dedicated to public use as squares.   Lands so dedicated could not lawfully be conveyed by the city to private parties, and therefore the conveyance by Congress did not inure in this particular to the benefit of Hoadley.   In short, the State refused to confirm the ordinance, so far as it had reference to the grant by the city of any part of these squares, and Congress in its conveyance followed in this particular what had been done by the State.

The judgment is

*Affirmed.*