[No. 8014. Department Two. October 9, 1909.]

EDWIN C. EWING, *Respondent*, v. THE CITY OF SEATTLE et al., *Appellants*.[1]

STREET RAILROADS—FRANCHISES—RESTRICTIONS—MUNICIPAL CORPORATIONS—CHARTERS—STATUTES. Charters adopted by cities of the first class are subject to and controlled by general laws; and Laws 1907, p. 192, authorizing cities to grant franchises to street railroads and to prescribe the terms and conditions thereof, supersedes the city charter of Seattle, art. 4, § 23, requiring such franchises to be sold at public auction to the highest bidder.

MUNICIPAL CORPORATIONS—FRANCHISES—LEGISLATIVE AUTHORITY—CONTROL BY COURTS. The power conferred upon the legislative authority of municipal corporations to grant franchises for the use of the streets is purely legislative and cannot be controlled by the courts.

STATUTES—SUBJECTS AND TITLES. An act entitled an act "relating to electric railways . . . and the use of streets and roads thereby" is sufficiently comprehensive to embrace provisions relating to the granting of franchises therefor by the legislative authority of cities.

Appeal from an order of the superior court for King county, Morris, J., entered February 10, 1909, granting a temporary injunction, after a hearing before the court upon the pleadings and affidavits. Reversed.

[1]Reported in 104 Pac. 259.

*Scott Calhoun, James E. Bradford, James B. Howe,* and
*R. G. Sharpe,* for appellants, contended, *inter alia,* that the
granting of the franchise was vested in the mayor and city
council and involves legislative action only.   McQuillan, Mu-
nicipal Ordinances, § 569; Nellis, Street Surface Railroads,
§ 4; 27 Am. & Eng. Ency. Law (2d ed.), 14-15; *Benton v.
Seattle Elec. Co.,* 50 Wash. 156, 96 Pac. 1033; *Tenny v.
Seattle Elec. Co.,* 48 Wash. 150, 92 Pac. 895; *Schwede v.
Hemrich Bros. Brewing Co.,* 29 Wash. 21, 69 Pac. 362;
*New Orleans Waterworks Co. v. New Orleans,* 164 U. S. 471,
17 Sup. Ct. 161, 41 L. Ed. 518; *State ex rel. Kansas City
v. East Fifth St. R. Co.,* 140 Mo. 539, 41 S. W. 955, 62
Am. St. 742, 38 L. R. A. 218; *Conery v. New Orleans Water
Works Co.,* 41 La. Ann. 910, 7 South. 8; *Kadderly v. Port-
land,* 44 Ore. 118, 74 Pac. 710, 75 Pac. 222; *Wright v.
Nagle,* 101 U. S. 791, 25 L. Ed. 921; *Des Moines Gas Co.
v. Des Moines,* 44 Iowa 505, 24 Am. Rep. 756; *Hayes v.
Michigan Cent. R. Co.,* 111 U. S. 228, 4 Sup. Ct. 369, 28
L. Ed. 410; *Alpers v. San Francisco,* 32 Fed. 503; *Kittinger
v. Buffalo Traction Co.,* 160 N. Y. 377, 54 N. E. 1081;
*State ex rel. Rose v. Superior Court,* 105 Wis. 651, 81
N. W. 1046, 48 L. R. A. 819; *Albright v. Fisher,* 164 Mo.
56, 64 S. W. 106; *West Seattle v. West Seattle Land & Imp.
Co.,* 38 Wash. 359, 80 Pac. 549; *Rapp v. Stratton,* 41 Wash.
263, 83 Pac. 182.   The provision authorizing the council to
reject "any and all bids" vests a discretion which is not re-
viewable by the courts.   1 Abbott, Municipal Corporations,
602; *Times Pub. Co. v. Everett,* 9 Wash. 518, 37 Pac. 695,
43 Am. St. 865; *Kelly v. Chicago,* 62 Ill. 279; *Common-
wealth v. Mitchell,* 82 Pa. St. 343; *Findley v. Pittsburgh,*
82 Pa. St. 351; *Douglass v. Commonwealth,* 108 Pa. St.
559; *Trowbridge v. Hudson,* 24 Ohio Cir. Ct. 76; *Anderson
v. Public Schools,* 122 Mo. 61, 27 S. W. 610, 26 L. R. A.
707; *Brown v. City of Houston* (Tex. Civ. App.), 48 S. W.
760; *State ex rel. Irondale Chert Paving & Imp. Co. v.
New Orleans,* 48 La. Ann. 643, 19 South. 690; *Gunning*

*Gravel & Paving Co. v. New Orleans*, 45 La. Ann. 911, 13 South. 182; *Girvin v. Simon*, 116 Cal. 604, 48 Pac. 720; *Ryan v. Mayor of Paterson*, 66 N. J. L. 533, 49 Atl. 587; *Trapp v. Newport*, 25 Ky. Law 224, 74 S. W. 1109; *Peckham v. Watsonville*, 138 Cal. 242, 71 Pac. 169; *Colorado Pav. Co. v. Murphy*, 78 Fed. 28, 49 U. S. App. 17, 37 L. R. A. 630. An unsuccessful bidder has not sufficient interest to maintain the suit. 2 Beach, Modern Law Contracts, p. 2266, § 1761; High, Extraordinary Remedies, § 92; *Colorado Pav. Co. v. Murphy, supra; State ex rel. Phelan v. Board of Education*, 24 Wis. 683; *Commonwealth v. Mitchell, Kelly v. Chicago, Times Pub. Co. v. Everett*, and *Douglass v. Commonwealth; supra; State v. McGrath*, 91 Mo. 386, 3 S. W. 846; *Madison v. Harbor Board*, 76 Md. 395, 25 Atl. 337.

*Higgins, Hall & Halverstadt* and *Edwin C. Ewing*, for respondent, contended, among other things, that the act of deciding between the bidders is not a legislative, but a judicial or ministerial act. Cooley, Constitutional Limitations, page 108; *Central Pac. R. Co. v. Gallatin*, 99 U. S. 718, 762, 25 L. Ed. 496, 516; *West Jersey Traction Co. v. Board of Public Works of Camden*, 56 N. J. L. 431, 29 Atl. 163; *City of Evansville v. State ex rel. Blend*, 118 Ind. 426, 21 N. E. 267, 4 L. R. A. 93; *Smith v. Strother*, 68 Cal. 194, 8 Pac. 852; *Wulzen v. Board of Supervisors of San Francisco*, 101 Cal. 15, 35 Pac. 353, 40 Am. St. 17; *State v. Johnson*, 61 Kan. 803, 60 Pac. 1068, 49 L. R. A. 662; *Tanner v. Nelson*, 25 Utah 226, 70 Pac. 984; *Knorr v. Miller*, 11 Ohio Dec. 165. And the courts will grant an injunction if the council acts corruptly, arbitrarily, or not in good faith. 1 Abbott, Municipal Corporations, 602; Beach, Public Corporations, § 698; *Gunning Gravel & Paving Co. v. New Orleans*, 45 La. Ann. 911, 13 South. 182; *Mueller v. Eau Claire County*, 108 Wis. 304, 84 N. W. 430; *McGovern v. Board of Public Works*, 57 N. J. L. 580, 31 Atl. 613;

*Wilson v. Inhabitants of Trenton* (N. J. L.), 38 Atl. 635;
*Van Rensselaer v. Shafer*, 121 N. Y. 712, 25 N. E. 4; *Faist
v. Mayor etc. of Hoboken*, 72 N. J. L. 361, 60 Atl. 720;
*Berry v. Tacoma*, 12 Wash. 3, 40 Pac. 414; *Times Print-
ing Co. v. Seattle*, 25 Wash. 149, 64 Pac. 940; *Puget Sound
Publishing Co. v. Times Printing Co.*, 33 Wash. 551, 74
Pac. 802. The plaintiff had sufficient interest as a taxpayer
to maintain the suit. *Berry v. Tacoma, Times Printing Co.
v. Seattle*, and *Puget Sound Publishing Co. v. Times Print-
ing Co., supra.*

PARKER, J.—This is an appeal from an order granting a
temporary injunction restraining the defendants from pro-
ceeding farther in their action towards granting to the inter-
vener a franchise to construct and operate a street railway
upon certain streets of the city of Seattle.

The power to grant such franchise by the legislative
branch of the city government is found in the Laws of 1903,
p. 364, as amended by the Laws of 1907, p. 192; and so far
as applicable to this controversy, is as follows:

"The legislative authority of the city or town having con-
trol of any public street or road, or where such street or
road is not within the limits of any incorporated city or
town, then the board of county commissioners wherein such
road or street is situated, may grant authority for the con-
struction, maintenance and operation of electric railroads or
railways, motor railroads or railways and railroads and rail-
ways of which the motive power is any power other than
steam, together with such poles, wires and other appurte-
nances upon, over, along and across any such public street
or road and in granting such authority the legislative au-
thority of such city or town or the board of county commis-
sioners, as the case may be, may prescribe the terms and con-
ditions on which such railroads or railways and their appur-
tenances shall be constructed, maintained and operated upon,
over, along and across such road or street, and the grade or
elevation at which the same shall be maintained and oper-
ated."

Section 23, art. 4, of the Freehold Charter of the city of Seattle, contains provisions which it is claimed by plaintiff limit and control the exercise of this power, as follows:

"Sec. 23. The city council shall not grant authority to construct a street railway or lay down railroad tracks upon or over any of the streets of said city, except in the manner and on the terms following, that is to say: Upon the application being made to the city council for authority to construct and operate a street railway along and upon any of said streets, the city council shall, by resolution, determine whether such franchise, or any part thereof, shall be granted, and after such determination, shall cause notice of such application and resolution to be published for ten days in the city official newspaper, at the expense of the applicant, and shall in such notice specify·the route over and along which it proposes to grant such franchise, and shall offer to grant the same to the person, company or corporation who will pay for the franchise the highest percentage annually of gross receipts, but not less than two per cent per annum. Bidding for such franchise must be in accordance with the provisions of this charter in relation to bids made to the board of public works, so far as such provisions may be applicable, and the city council may reject any and all bids, and may refuse to grant a franchise for any part of the route for which the application was made. Each bid must be accompanied by a certified cheque, payable to the order of the city comptroller, for the sum of one thousand dollars, and the amount of the cheque shall be forfeited and paid to the city in case the successful bidder shall fail to accept the franchise, and upon acceptance the sum so paid shall be credited to the grantee on account of percentages. The same method of procedure shall obtain in the case of the extension of such franchise or any existing franchises."

With these statute and charter provisions before us, we will notice the undisputed facts as they appear by the pleadings and affidavits before the court upon the hearing of the application for the temporary injunction. Since our view of the case would be unaffected by the disputed facts, we need not notice them.

On November 9, 1908, the intervener made application to

the city of Seattle for a franchise to construct and operate a street railway upon certain streets of the city, and thereupon there was introduced in the city council an ordinance for the granting of such franchise, wherein was fully prescribed the terms and conditions thereof, among other things, providing:

"The grantee, its successors or assigns, shall pay annually to the City of Seattle ...... per cent per annum of the gross receipts derived from the operation of said railway, from and after the date of the acceptance of this franchise until its expiration, and in addition thereto shall pay annually to the city of Seattle, from and after the first day of January, A. D. 19...., and until the expiration of said franchise, an additional percentage of ..... per cent, of the gross receipts derived from the operation of said railway from and after said first day of January, A. D. 19....."

On December 7, 1908, the city council passed a resolution by which it determined to grant such franchise, and thereupon caused notice of the application, resolution and proposed ordinance granting the franchise to be published, inviting bids, as provided by the charter provisions above quoted. On January 4, 1909, in pursuance of the notice, bids were received by the council, when the intervener bid and offered to pay for the franchise two per cent per annum of the gross receipts derived from the operation of the railway under the franchise until its expiration, and one per cent per annum additional after January 1, 1920, until its expiration; and the plaintiff bid and offered to pay for the franchise ten per cent per annum of the gross receipts derived from the operation of the railway under the franchise until its expiration, and fifteen per cent per annum additional after January 1, 1920, until its expiration. No other bids were received. Certified checks accompanied the bids as provided by the charter.

On January 18, 1909, after considering the bids, the council accepted the bid of the intervener, and formally passed the ordinance granting the franchise to it. On January 19,

1909, the ordinance was by the clerk presented to Honorable John F. Miller, mayor, for his approval. On the same day the superior court issued a temporary restraining order, at the instance of plaintiff, against the defendants, restraining the mayor from signing the ordinance or taking any action thereon other than to veto it, restraining the clerk from publishing it, and restraining the council from passing it over the mayor's veto, until the further order of the court, and directing the defendants to show cause on January 29, 1909, why a temporary injunction should not issue enjoining them from doing any of said acts, until the final hearing of the cause. On January 29, 1909, the cause came on for hearing upon the order to show cause, and the matter being heard upon the pleadings and affidavits read in behalf of the respective parties, the court granted a temporary injunction, restraining the defendants until final hearing of the cause, substantially as in the temporary restraining order. From this action of the court, the defendants and intervener have appealed.

The grounds upon which the plaintiff sought to have the defendants enjoined are, in substance, that the council did capriciously, arbitrarily, without right or power so to do, in violation of his rights in the premises, and contrary to the provisions of the charter above quoted, determine that the bid of the intervener be accepted and that the bid of the plaintiff be rejected; and did capriciously, arbitrarily, without right or power so to do, in violation of his rights in the premises, and contrary to the provisions of the charter, attempt to grant said franchise to the intervener, by the passing of said ordinance. Several affidavits in behalf of the respective parties were read upon the hearing, both in support of and against this contention. It may be conceded, for the sake of argument, that the showing made in behalf of the plaintiff was such as to warrant the learned trial court in granting the temporary injunction, provided the action of the legislative branch of the city government in the premises

was of that nature which is subject to control by the courts.

The principal contention of counsel for the defendants and intervener is that the granting of the franchise is a legislative act, and therefore an act which the lower court had no power to restrain. Answering this contention, counsel for plaintiff contend that the process of granting the franchise under the charter provisions is divided into two parts; first, the legislative process of determining whether or not a franchise shall be granted, and of determining its terms and conditions; and second, the ministerial or at most judicial process of determining the highest bid and naming the grantee. It is plain, indeed it seems to be conceded, that in so far as their acts are purely legislative, the courts have no lawful power to interfere with or restrain the mayor or council, and that the grant of the franchise would be wholly legislative but for the charter provisions above quoted relating to the offering of the franchise to the highest bidder. In the case of *Tenny v. Seattle Electric Co.*, 48 Wash. 150, 92 Pac. 895, this court, following the general rule, said,

"The passage of an ordinance by a city council granting a franchise to a public service corporation involves legislative action only .. . . Such legislative action cannot be reviewed by a writ of certiorari."

In the case of *New Orleans Waterworks Co. v. New Orleans*, 164 U. S. 471, 17 Sup. Ct. 161, 41 L. Ed. 518, where it was sought to enjoin the city from granting certain franchises, the supreme court of the United States, speaking through Justice Harlan, uses this pertinent language at page 481:

"A court of equity cannot properly interfere with, or in advance restrain, the discretion of a municipal body while it is in the exercise of powers that are legislative in their character. It ought not to attempt to do indirectly what it could not do directly. In view of the adjudged cases, it cannot be doubted that the legislature may delegate to municipal assemblies the power of enacting ordinances that relate to local matters, and that such ordinances, if legally enacted, have

the force of laws passed by the legislature of the state, and
are to be respected by all. But the courts will pass the line
that separates judicial from legislative authority if by any
order or in any mode they assume to control the discretion
with which municipal assemblies are invested, when deliberat-
ing upon the adoption or rejection of ordinances proposed
for their adoption. The passage of ordinances by such bodies
are legislative acts which a court of equity will not enjoin."

The argument of learned counsel for plaintiff, wherein
they contend that the matter of determining the highest bid-
der and to whom the franchise shall be granted is only minis-
terial or at most judicial, under this charter provision, and
therefore may involve such an abuse of discretion on the part
of the mayor and council as to call for interference by the
courts, is plausible, and has been presented to us with marked
ability. It has for its foundation, however, the assumption
that the council was legally required to advertise for, invite
bids, and offer to grant the franchise to the highest bidder,
as prescribed in the freehold charter of the city. If the legis-
lative authority of the city, to which the power to grant such
franchises has been given by direct act of the legislature, was
not required, as a matter of law, to determine to whom the
franchise should be granted, in the manner provided by the
charter, then there could be no such thing as an abuse of the
discretion vested in the mayor and council, such as the courts
could lawfully review, because that discretion would, in any
event, then be purely legislative.

This brings us to the question, Was the legislative author-
ity of the city legally required to follow the charter provisions
in determining to whom it would grant the franchise? We
have seen that the legislature has directly conferred upon the
legislative authority of the city, by the acts of 1903 and
1907, power to grant such franchises, and also power to "pre-
scribe the terms and conditions on which such railroads or
railways and their appurtenances shall be constructed, main-
tained and operated . . . " If this legislative grant of
power is superior to the limitations and restrictions con-

tained in the freehold charter, then it is evident, by its plain terms, that the legislative authority of the city was not legally required to follow the charter method in determining to whom it would grant such franchise, but could lawfully exercise its own judgment upon that question. And the fact that bids were invited and received in the manner provided by the charter would in no wise lessen the power of the legislative branch of the city government to ultimately determine the question in any way it saw fit. While our constitution has reserved to the people of cities of the class to which Seattle belongs the power to frame and adopt charters for their own government, it also provides that such charters "*shall be subject to and controlled by general laws.*" And this court has repeatedly and uniformly held that where the legislature has enacted laws relating to such cities, or to the powers and duties of their officers, such laws supersede charter provisions in conflict therewith. *State ex rel. Seattle v. Carson,* 6 Wash. 250, 33 Pac. 428; *Reeves v. Anderson,* 13 Wash. 17, 42 Pac. 625; *Tacoma Gas & Elec. Light Co. v. Tacoma,* 14 Wash. 288, 44 Pac. 655; *Hindman v. Boyd,* 42 Wash. 17, 84 Pac. 609; *Renton v. Seattle Electric Co.,* 50 Wash. 156, 96 Pac. 1033.

It seems to us the principle involved, and upon which these cases were decided, is decisive of this case. In the case last cited, acting under the power conferred by the Laws of 1903 and 1907 above quoted, the legislative authority of Seattle, that is the mayor and city council, enacted an ordinance granting a street railway franchise, without complying with the provision embodied in the amendment to the city charter of March, 1908, requiring certain conditions to be embodied in the franchise, and also requiring, under certain conditions, the submission of the question of granting of the franchise to a vote of the people of the city. These provisions of the charter being ignored, it was contended that the franchise was void, and it was sought to enjoin the grantee from proceeding to construct its railway thereunder. Referring to the scope

of the power given to the legislative authority of the city by
these laws, at page 161 of that decision, the court said:

"These latter statutes vest in the 'legislative authority' of
the city power to prescribe the terms and conditions upon
which electric railroads and railways may be constructed,
operated, and maintained. It is maintained that the expres-
sion 'legislative authority of the city' means the mayor and
city council. This contention is doubtless correct. That ex-
pression as used in § 10, art. 11, of the state constitution and
in numerous statutes of the legislature, undoubtedly means
the mayor and council of the city. Bal. Code, § 740 (P. C.
§ 3733). . . . While the direct amendment statute vests
power in the city to amend its charter, yet this cannot be
construed to mean that the charter can be so amended as to
override a statute of the legislature which was intended to
and does deal directly and specifically with the subject-mat-
ter in question."

Then after noticing former decisions of the court as to
the effect of general state laws upon freehold charter pro-
visions, the opinion concludes with this language:

"This case is clearly distinguishable from that of *Hind-
man v. Boyd, supra,* wherein a charter amendment, adopted
by the voters of the city, involved a gas franchise, there be-
ing no special statute of the legislature vesting the power
over such matters directly and specifically in the 'legislative
authority' of the city as is the fact in the case at bar. We
think that, under the statutes of the state, the city council
was without authority to submit to the voters for their rati-
fication any ordinance granting a franchise for a street rail-
way company, inasmuch as the power of granting franchises
of this kind is vested directly and specifically by the legis-
lature in the legislative authority of the city; that is, in the
mayor and city council. For these reasons the ordinance
granting the franchise involved in this action was legal and
valid, and it was not necessary nor proper that it should
have been submitted to the voters. Neither was it necessary
to embody the restrictions and limitations provided for in
said charter amendments adopted at the municipal election
in March, 1908."

If that charter amendment did not legally require the legislative authority of the city to embody the conditions therein specified, in the franchise, and did not legally require the submission of the franchise to a vote of the people of the city, because of the broad powers given by the state legislature in these laws, then, upon the same principle, the legislative authority of the city was not legally required to invite bids for the franchise, nor legally required to grant the same to the highest bidder. If the charter provision does not limit or control the exercise of the power granted by the state law in the one instance, it is manifest it does not do so in the other. It having become the settled law of this state, by the construction repeatedly placed upon the constitution, that a general law enacted by the legislature is superior to and supersedes all freehold charter provisions inconsistent therewith, it becomes plain that, when the legislature, by the Laws of 1903 and 1907, gave to the legislative authority of the cities of the state the power to grant street railway franchises, and also the power to "*prescribe the terms and conditions on which such railways . . . shall be constructed, maintained and operated,*" that power cannot be limited or prescribed by freehold charter provisions. The legislative power given by these laws to the mayor and council, to grant such franchise, includes the power to name the grantee, which power, under such laws, is as purely legislative as any other part of the power conferred. To hold that a freehold charter provision may so limit this power as to reduce the exercise of it to a mere ministerial or at most a judicial act, thus rendering it reviewable by the courts, would be to take from the mayor and council a portion of the legislative power directly conferred upon them by a general law of this state.

Learned counsel for the plaintiff argue that the *Renton* case, last above cited as an authority in this case, is open to serious question for a reason not brought to this court's

attention in its presentation; to wit, that the title to acts of 1903 and 1907, upon which that decision rests, are not broad enough to support an enactment divesting the people of a freehold charter city of power to limit and control the legislative power of the city in granting street railway franchises. The title of the act of 1903, repeated in the amendatory act of 1907, is as follows:

"An act relating to electric railroads, street and other electric railways, and corporations incorporated for the construction, ownership or operation thereof, the right of eminent domain therefor, the use of streets and roads thereby and leases and sales thereof heretofore or hereafter made." Laws 1903, p. 364, ch. 175.

It seems to us that the words "An act relating to electric railroads, street and other electric railways. . . . *the use of streets and roads thereby*" etc., is sufficiently broad and comprehensive to bring the provision of the act relating to the granting of franchises for such railways by the legislative authority of cities clearly within the subject-matter so expressed in the title.

We are of the opinion that the order of the learned superior court granting the temporary injunction should be reversed, for the reasons that the acts of the legislative authority of the city so attempted to be enjoined are purely legislative, and therefore the courts have no lawful authority to enjoin the same. It is so ordered.

RUDKIN, C. J., CROW, DUNBAR, and MOUNT, JJ., concur.