[No. 16383. Department Two. August 29, 1921.]

PIERRE P. FERRY et al., Respondents, v. THE CITY OF
SEATTLE, Appellant.[1]

INJUNCTION (30)—PROCEEDINGS OF CITY COUNCIL—VALIDITY OF
ORDINANCE—REVIEW. Where a city council acts in good faith upon
a matter within the scope of its authority, its exercise of discretion
will not be controlled by injunction by a court of equity, in the ab-
sence of fraud.

MUNICIPAL CORPORATIONS (398) — INJUNCTION (30) — PARKS—
USES—DIVERSION—CONSTRUCTION OF RESERVOIR. Where a city ac-
quired land in fee simple by purchase, without any restriction on
its use, which it devoted to park and reservoir purposes, its threat-
ened use of a portion of the park land for increased reservoir pur-
poses is not subject to restraint by a court of equity.

SAME (398)—PARKS—CHARTER PROVISIONS—AUTHORITY OF COUN-
CIL—LEGISLATIVE POWERS. The city charter of Seattle, which cre-
ates a board of park commissioners, does not confer on such board
power to control the disposition to be made of such property, but
confers merely administrative powers, the legislative power over
city property being vested in the city council.

NUISANCE (2, 18)—WHAT CONSTITUTES—ACTIONS FOR ABATEMENT—
EVIDENCE. An objection to the construction of a city reservoir to
store water for domestic use on the theory that the drainage from a
neighboring cemetery would contaminate the water was not sus-
tained where the evidence showed that, by reason of the contour of
the land, the drainage would be away from the reservoir, and fur-
ther that the pressure of water would cause the reservoir water it-
self to leak out, and naturally, even if there were drainage from
the cemetery, it could not leak in.

SAME (2, 5)—ACTIONS FOR ABATEMENT. In an action to enjoin
the construction of a city reservoir on the ground that it would ob-
struct the free use of the residential property of plaintiffs and in-
terfere with their comfortable enjoyment of life and property, thus
constituting a nuisance within the terms of Rem. Code, §§ 943, 944,
held, that the evidence was insufficient to support the complaint
(Overruled on rehearing).

INJUNCTION (11)—GROUNDS FOR RELIEF—DEFENSES—INCONVEN-
IENCE TO PUBLIC. An injunction will not issue to restrain the con-
struction and maintenance of a reservoir for the storage of water

[1]Reported in 200 Pac. 336; 203 Pac. 40.

for domestic use, though based upon evidence of the fears of apprehended injuries to the persons or property of adjoining owners, where the weight of the evidence shows that such apprehended injuries are not the necessary or probable results of the maintenance of the reservoir (Overruled on rehearing).

MACKINTOSH, J., dissents.

ON REHEARING.

NUISANCE (2, 5, 18)—WHAT CONSTITUTES—ACTIONS FOR ABATEMENT. A city reservoir, impounding water by a fifty-six foot embankment of soil subject to slides and inevitable leakage, will be enjoined as a nuisance, interfering with the comfortable enjoyment of life and property, where a large section of the city, composed of men and women not ready dupes of conjectural and imaginary fears, have a real and present reasonable apprehension that their lives and properties will be jeopardized by the maintenance of the reservoir (MITCHELL, MAIN, and TOLMAN, JJ., dissenting).

Appeal from an order and judgment of the superior court for King county, Tallman and Allen, JJ., entered September 30, 1920, and December 14, 1920, in favor of the plaintiffs, in an action to enjoin the construction of a reservoir in a city park, after a hearing before the court. Reversed.

*Walter F. Meier* and *Edwin C. Ewing,* for appellant.

*C. H. Hanford, Kerr, McCord & Ivey, John F. Murphy,* and *Samuel Hill,* for respondents.

MITCHELL, J.—This is an appeal from a final decree of the superior court of King county, by the terms of which the city of Seattle was enjoined from constructing, at a selected site in Volunteer Park, a reservoir for the storage of water for the uses of the city and its inhabitants. The appeal also involves an allowance imposed as terms upon granting a trial amendment of the city's answer that necessitated a continuance.

The city owns and operates its waterworks system, and the growing need for an additional reservoir has been apparent to the city authorities for several years. A number of sites were carefully considered and inves-

tigated, with the result of the selection of the site proposed. The drift of the judgment of the city council has been towards this site, during which time, and for the last four or five years, the subject has been discussed in the press, in open sessions of the city council, and in the sessions of its appropriate committee. There appears to be no question of the wisdom in the selection of the site from the standpoint of economy and the practical distribution of the water. By appropriate ordinances, the city adopted plans and specifications and proposed the sale of utility bonds, payable out of the revenues of the waterworks system, for the construction of the reservoir and the relining of a reservoir already in the park, among other expenditures, as betterments to and extensions of its present system. Upon calling for bids for making the necessary excavation and earthen embankments, this action was commenced by a number of persons in their own behalf and for all others similarly situated, taxpayers and owners of property in the vicinity of the park, to prevent the construction of the reservoir. The suit resulted, as already stated, in favor of the plaintiffs. During the suit, a temporary injunction was entered against the city, whose appeal therefrom is now presented with its appeal from the final decree. The disposition of the final appeal will dispose of the merits of the appeal from the interlocutory order.

It may be observed, that, assuming the city council acts in good faith and within the scope of its lawful authority, courts of equity are generally without power to interfere, or as stated in *State ex rel. News Publishing Co. v. Milligan*, 3 Wash. 144, 28 Pac. 369, viz.:

"No principle of equity jurisprudence is better established than that courts of equity will not sit in review of proceedings of subordinate political or municipal tribunals, and that where matters are left to

the discretion of such bodies the exercise of that discretion in good faith will not, in the absence of fraud, be disturbed. High on Injunctions (3d ed.), § 1240.''

See, also, *Ewing v. Seattle,* 55 Wash. 229, 104 Pac. 259; *Twitchell v. Seattle,* 106 Wash. 32, 179 Pac. 127.; Pomeroy's Equity Jurisprudence (4th ed.), vol. 4, § 1765.

Volunteer Park consists of about fifty acres, acquired as follows: Forty acres from James M. Colman and wife by warranty deed to the city June 12, 1876, and the east half of blocks E and F, Phinney's Addition to Seattle, located immediately west of the forty-acre tract and separated from it by an avenue afterwards vacated, by warranty deeds to the city in the year 1902. All of the conveyances were by straight warranty deeds, none of which contained any reservation, restriction or limitation upon the title or use of the property thereby conveyed.

In 1887, by ordinance, the city converted the forty-acre tract into a park. Later it made provision for a water tank which was constructed in the park, then called the City Park. In 1901, by ordinance, the park was given the name of Volunteer Park. In 1900 and 1901, the city constructed a reservoir, still in use, in the park. The city has spent about $139,000 in improving the park.

The first theory of the complaint and argument of respondents is that the ordinance of the city declaring the property to be a public park, the subsequent use of it as such, and the expenditure of public money for its adornment, amount to an irrevocable dedication of it for park purposes. Indeed, it is argued that the course of the city with reference to the park operates as a conveyance of the land to the public for that specific use, so that it may not be thereafter devoted to a

different use otherwise than by the exercise of the power of eminent domain; and for the support of such claim, reliance is had on the cases of *Cincinnati v. Louisville & N. R. R.*, 223 U. S. 390, 56 L. Ed. 481; *Cincinnati v. White*, 6 Pet. (U. S.) 431, 8 L. Ed. 452; and *Hoadley's Adm'rs v. San Francisco*, 124 U. S. 639.

The argument is without merit, we think, and the cases cited are not applicable here. *Cincinnati v. Louisville & N. R. R.* was a case involving the right of a railroad company to condemn a right of way for an elevated track across a public landing at Cincinnati that had been dedicated by the former owner for public use. It was decided that condemnation might be had, and, among other things, it was said, in effect, that a dedication by a private owner of land as a common, for the use and benefit of the town forever, as shown on a plan, and the acceptance by the town and sale of lots under the plan, constitutes a contract. The case of *Cincinnati v. White* involved the dedication of privately owned land to a city for public use, accepted and used as such by the city. It was held that a person who thereafter acquired a paper title from the former owner to the same property could not disturb the city in its right to the title and use of the common. The case of *Hoadley's Adm'rs v. San Francisco* related to land that was granted by Congress to the city for the purpose of public use as squares, and it was held "lands so dedicated could not lawfully be conveyed by the city to private parties." The doctrine of such cases is well established and recognized, but they are outside of the inquiry here. The city of Seattle acquired this property in fee simple, by purchase. During its ownership it has used it to its own fancy for the purposes of a park and a reservoir. The situation falls within the rule laid down in the case of *Caldwell*

*v. Seattle,* 75 Wash. 565, 135 Pac. 470, wherein owners
of property abutting upon a public park were denied
injunction against the location of a main trunk sewer
through the park, located so that a part of the sewer
was above 'the ground. In that case it was said:

"The particular tract upon which appellants' prop-
erty abuts was deeded without reservation and the full
fee simple title was conveyed. Under such conditions,
the city holds clothed with every incident of owner-
ship. Parks are relatively necessary in modern cities,
but sewers are absolutely necessary, and courts will
not control the discretion of the governing bodies of
cities when they have ordained that a sewer shall be
placed in a park, nor will the necessity of laying the
sewer on top of the ground be reviewed.

"The judgment of the court is sustained by refer-
ence to the principles announced in *Seattle Land &
Imp. Co. v. Seattle,* 37 Wash. 274, 79 Pac. 780. The
building of the sewer upon the city's property is not
necessarily a diversion of the uses of the park, and
is as to appellants *damnum absque injuria.*"

And here, as in that case, there is no destruction of
the park, but only an appropriation of a part of the
total area for a necessity different from strictly park
purposes.

Further, it is contended by the respondents that the
city charter, which was adopted after Volunteer Park
had been established, forbids interference by the city
council with the use of the public park as such. It
contains no specific provision to that effect. The char-
ter distributes the corporate powers of the city under
fourteen different departments, including the "depart-
ment of parks" in charge of a board of park commis-
sioners. Numerous provisions of the charter are re-
ferred to which it is claimed show that the park board
and not the city council has ultimate control in decid-
ing if a portion of the park shall be used for a reser-
voir. A repetition and analysis of all such provisions

is unnecessary here. An examination of them convinces us, as it did the trial court, against this contention of the respondents. There is not to be found in the charter or in the statutes any attempt to make of the department of parks or the board of park commissioners a separate entity such as a municipal corporation. Many of the cases relied on by the respondents, such as *McCormick v. South Park Commissioners*, 150 Ill. 516, 37 N. E. 1075; *City of Chicago v. Pittsburg, C. C. & St. L. R. Co.*, 242 Ill. 30, 89 N. E. 648, and *City of Fargo v. Gearey*, 33 N. D. 64, 156 N. W. 552, are cases wherein the parks involved were under the control of boards of commissioners which by statute were made municipal corporations with the power to acquire, hold, own and possess real property and to levy and collect taxes and assessments. No such authority is given to the board of park commissioners of Seattle. However, ample authority is given to the legislative department of the city. In paragraph 3, § 18 of art. 4, it is provided that the city council shall have power by ordinance "to control the finances and property of the city; *Provided,* That the city council shall have no administrative as distinguished from the legislative power." Paragraph 4 of the same section provides that the city council shall have power by ordinance

"to acquire by purchase, or by exercise of the right of eminent domain or otherwise, and for the use and in the name of the city, such lands and other property as may be deemed necessary, proper or convenient for any of the corporate uses provided for by this charter, and to acquire for the use of the city any property by gift, bequest or devise, and to dispose of all such property as it shall have, as the interests of the city may from time to time require."

. The relative powers of the department of parks and of the city council are that those of the one are admin-

istrative, while those of the other are legislative. Having acquired the full fee simple title to the property, the city holds it clothed with every element of ownership, to be controlled under and by the final and superior authority of its legislative department. This view is in accord with the conclusion and reason of the rule of *Caldwell v. Seattle, supra.*

Another theory of the complaint (supported by some lay evidence) that has not been sustained, in our opinion, is that the selected site, by reason of its proximity to a cemetery, is an improper place to store water to be supplied for domestic use. The proof clearly shows two satisfactory answers: (a) The contour of the ground is such that the drainage from the cemetery is away from the site of the reservoir; and (b) the common sense view of the city health officer (an experienced sanitary expert), who, after listening to the construction and engineering experts testify that it was impossible to prevent all leakage from a reservoir constructed as this would be with a lining of concrete, upon being asked as to the danger of the water becoming contaminated and polluted because of the nearness of the cemetery, replied by saying: "It is impossible, the lining of concrete cannot leak both ways."

By far the greater part of the large record in this case is devoted to the subject of nuisance. Respondents rely on §§ 943 and 944, Rem. Code, §§ 8231 and 8232, Pierce's 1919 Code, which provide, among other things, that "an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of the life and property, is a nuisance, and the subject of an action for damages and other and further relief," and that "such action may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance." The present reservoir in the park

holds twenty-three million gallons of water. It is charged in the complaint that the placing of the additional reservoir therein, if permitted, would constitute a nuisance and menace to the property and lives of the respondents and others. More specifically, it is alleged that a reservoir in the situation chosen would create a condition conducive to a landslide and flooding of the hillside below the reservoir that would destroy some of the residential property owned by the respondents, and be an immediate danger by depreciating the market value of the property and its value for living in security and comfort therein. The proposed basin is to be constructed on a slope near the crest of the hill on which the park is located, about four hundred feet above the sea level. The structure will consist of an earthen embankment on the lower side about fifty-six feet high at one point. The inside incline of the embankment will be one to one and a half, and the outside one to two. The whole of the earthen basin is to be treated and prepared for a lining of concrete slabs seven inches thick, the joints of which are to be sealed with copper according to an improved method. The top of the reservoir on the side of the embankment will be forty feet in width and level with the top of the existing reservoir.

None of the witnesses would expect to find artesian water in the hill. The evidence shows that there has been no perceptible subsidence or disintegration of the embankment of the existing reservoir since it was built twenty years ago and that, as the trial court found, it is entirely safe at the present time. The evidence shows with convincing force that the geological formation of the site and hill is highly suitable for the safe construction and maintenance of the additional reservoir; it shows, in the same manner, that the con-

sensus of engineering opinion is that earthen dams or embankments are the stablest kind, and that it is perfectly safe and suitable for impounding water to construct a reservoir on the side of a hill by excavating a portion of the earth and using the material to form an embankment on the lower side—a very general practice in American cities. The evidence shows also, in the same manner, that the building of a reservoir according to the completed plans and specifications, under the supervision and directions of the city's engineer, and the maintenance of it thereafter under the customary and required inspections of the public authorities, can and will cause no damage or menace to the respondents or their property or others in the vicinity, or at all. The record abounds with endorsements of the plans and specifications by a large number of persons skilled and experienced as hydraulic and construction engineers, many of whom have a knowledge of the geological formation of the hill and of the surrounding country generally, while many of them have been engaged in connection with public works and the study of the different kinds of soils in and about the city for years.

On the contrary, there were expert witnesses for the respondents who testified in reason to the incompleteness of the plans and specifications with reference to the total project, including the matter of drainage. That testimony was given, however, at a time when the city, by its answer, was apparently committed to a defense of its plans and specifications for the construction of the earthen dam only as affording a safe and proper structure. Thereafter, upon application and order, the city's answer was amended to show that the completed work was to be accomplished by units, and that, after the earthen work was done, still another

contract was to be let and carried out for the concrete lining and proper provision made for. drainage. It was after the amendment of the answer that the city's proof was introduced; but after the amendment, only two of appellant's witnesses then testified in criticism of the total plans and specifications, or that the reservoir would be unsafe or a menace to persons or property. Of these two witnesses, one frankly admitted he had made no examination of, and was unacquainted with, the ground where the reservoir is to be located; and withal, while admitting the general sufficiency of the plans and specifications, the principal objection of both witnesses was that no detail of plan had been made to take care of drainage during the construction, nor for inevitable leakage, to some extent, during the maintenance of the reservoir—that is, the plans and specifications were not precise in those particulars. However, the objection is fully answered by general provisions, such as are customarily and usually found in such contracts and instruments. The evidence shows the impossibility of providing by specific details in advance for all possible contingencies that may arise. The necessary and intelligent provisions for such contingencies can be estimated and determined only as the excavation and construction proceed, and are to be then taken care of under clauses in the contract, such as are found here, authorizing the engineer or board of public works to make such provisions as may then appear to be necessary, either by payment at a price then agreed on or by force account.

The relief here sought is an appeal to equity. Under the facts, we are compelled to find against the respondents. The reservoir is a necessity. The construction and maintenance of it in a proper manner and place would not constitute a nuisance in a legal sense; nor

would it, as a matter of fact, under the evidence in this case. In this class of cases the courts are not called upon to determine only if plaintiffs, or any one of them, entertain fears for the safety of themselves or their property, but to ascertain if, by evidence that is clear and satisfactory, it is shown that such injuries are or will be the necessary or probable results of the action sought to be restrained. The test is not what may possibly occur, but what may be reasonably expected to happen. This rule is well stated in *People v. Canal Board of New York,* 55 N. Y. Ct. App. 390, as follows:

"To entitle a plaintiff to prohibition by injunction from a court of equity, either provisional or perpetual, he must not only show a clear legal and equitable right to the relief demanded or to some part of it, and to which the injunction is essential, but also that some act is being done by the defendant, or is threatened and imminent, which will be destructive of such right, or cause material injury to him. A state of things from which the plaintiff apprehends injurious consequences to himself, but which neither actually exists nor is threatened by the defendants, nor is inevitable, is not a sufficient ground for an injunction.

"Injury, material and actual, not fanciful or theoretical, or merely possible, must be shown as the necessary or probable results of the action sought to be restrained."

In the case of *City of Rochester v. Erickson,* 46 Barb. (N. Y.) 92, it was said:

"It is not enough to make out a doubtful or possible case of danger; but the danger apprehended must appear to be imminent, and in the natural course of events clearly impending, and the mischief in its nature and character irreparable."

In *Missouri v. Illinois,* 180 U. S. 208, 40 L. Ed. 497, it was said:

''We fully agree with the contention of defendants' counsel that it is settled that an injunction to restrain a nuisance will issue only in cases where the fact of nuisance is made out upon determinate and satisfactory evidence; that if the evidence be conflicting and the injury be doubtful, that conflict and doubt will be a ground for withholding an injunction; and that, where interposition by injunction is sought, to restrain that which is apprehended will create a nuisance of which its complainant may complain, the proofs must show such a state of facts as will manifest the danger to be real and immediate.''

In *Lake Erie & W. R. Co. v. City of Fremont*, 92 Fed. 721, it was said:

''But it is well settled that an injunction does not issue in such cases unless the probability of danger is clearly shown, and the existence of the nuisance clearly made out upon determinate and satisfactory evidence, and that in no case will the chancellor interfere by injunction where the nuisance sought to be abated. or restrained is eventual or contingent, or where the evidence is conflicting, and the injury to the public, or to the individual complaining, doubtful.''

Again, the rule is stated and supported by a long list of cases in 14 R. C. L., p. 354, § 57, as follows:

''A mere apprehension of future injury is not enough to warrant the issuance of a permanent injunction; it must appear, to the satisfaction of the court, that such apprehension is well grounded, that there is a reasonable probability that a real injury, for which there is no adequate remedy at law, will occur if the injunction be not granted. If it is doubtful or contingent equity will not interfere by injunction.''

Some of the cases in this court to the same effect are *Hughes v. McVay*, 113 Wash. 333, 194 Pac. 565; *Rea v. Tacoma Mausoleum Ass'n*, 103 Wash. 429, 175 Pac. 961; *Winsor v. Hanson*, 40 Wash. 423, 82 Pac. 710; *Rockford Watch Co. v. Rumpf*, 12 Wash. 647,

42 Pac. 213; *Morse v. O'Connell,* 7 Wash. 117, 34 Pac. 426.

The conclusion reached on the merits of the case makes it unnecessary to discuss or otherwise dispose of the second branch of the appeal relating to the terms imposed by the court on granting the city leave to amend its answer.

The judgment is reversed, with directions to set aside the injunction and dismiss the action.

PARKER, C. J., MAIN, and TOLMAN, JJ., concur.

MACKINTOSH, J., dissents.

## ON REHEARING.

### [*En Banc.* January 3, 1922.]

MACKINTOSH, J.—Upon a reargument of this case, the court has decided that the opinion of the Department on the prior hearing is incorrect, and that the judgment of the trial court should have been affirmed.

A reference to the prior opinion is sufficient to give an understanding of the facts of the case. Without determining whether Volunteer Park has been dedicated by declaration, use and the expenditure of public money thereon to exclusive park purposes, so that it cannot now be used for any other purpose, and without determining whether exclusive jurisdiction has been placed in the park department rather than in the city council, and leaving undetermined the question of whether the respondents are entitled to an injunction against the appellant based on the impairment of the beauties of the park, leaving also undetermined the question whether the proposed reservoir might be contaminated by its proximity to a large burial ground, we will pass to the question which determines the respondents' rights to an injunction.

The respondent property owners complain against the construction of this reservoir in Volunteer Park,

on a side hill which extends westerly a considerable distance, with its fifty-six foot embankment as the only protection between their homes and the mass of water impounded behind it, for the reason that they claim its existence will constantly menace their lives and property. It is true that expert witnesses called on behalf of the city testified that a reservoir constructed in this place and manner would present no such peril as the respondents picture, and the city points to another reservoir in this park, which has existed some twenty years and never has occasioned damage to adjacent property. The old reservoir, it must be remembered, is small compared with the proposed one, and its westerly side is protected by an embankment only about one-third as high as would be that of the new reservoir. But at that, the fact that the old reservoir has occasioned no damage is far from conclusive proof that a new one, constructed under different conditions, would be equally as harmless. On the other hand, experts on behalf of the respondents testified that the proposed reservoir would continually threaten danger. With such a record before us, it is difficult to say that the respondents have not a reasonably grounded apprehension.

The test as to whether a structure of the proposed character is to be declared a nuisance turns on whether the complaining property owners are under a reasonable apprehension of danger, and the question of the reasonableness of the apprehension turns again, not only on the probable breaking of the reservoir, but the realization of the extent of the injury which would certainly ensue. That is to say, the court will look to consequences in determining whether the fear existing is reasonable. For instance, if the reservoir were being built in some place where, should it break, the resultant damage would be merely to property which could ade-

quately be recompensed, the court would be more apt to hesitate in declaring it a nuisance than where, should a break occur, not only property of immense value would be destroyed, but many lives would be lost as well.

It cannot be said that the property owners dwelling in the shadow of the fifty-six foot embankment would not live under a reasonable apprehension, based upon the testimony in this case, that sooner or later they and their property would be destroyed by this contemplated reservoir. Reservoirs built upon the expert advice of city engineers, and sealed with the approval of other experts called in to substantiate that advice, have been known to not hold water. All the experts agree that there will be an inevitable leakage, to some extent, in the proposed reservoir. With this advice of these experts, and with a general knowledge of the contour of the ground, the nature of the soil, the prevalence of slides in similar situations in Seattle, and the disasters that have happened from the bursting of impounded waters, the respondents have, as a result of all these things, a fear which interferes with their comfortable enjoyment of life and property, and allege that the construction of the reservoir annoys, injures and endangers their comfort, repose and safety, and renders them insecure in life and the use of their property. If they have reason for this attitude they must succeed in this action. If this situation supports a reasonable expectation that disaster may happen, and such expectation leads to a depreciation in the value of adjoining properties, the structure will be considered a nuisance.

This court has already held in *Everett v. Paschall*, 61 Wash. 47, 111 Pac. 879, Ann. Cas. 1912B 1128, 31 L. R. A. (N. S.) 827, that the building of a tuberculosis sanitarium in the residential section of a city will be en-

joined as a nuisance where its construction creates fear and dread of disease, which will result in a depreciation of the value of adjacent property, and where it will affect the mind, health and nerves of the occupants thereof. Sections 943 and 8309, Rem. Code (P. C. §§ 8231, 9131-68), describe as a nuisance anything which is injurious to the health, or which is an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life and property. The court said, in the sanitarium case, *supra,* that, although the danger of communication of disease might be reduced to a negligible quantity, and that such a sanitarium might be constructed with due regard to the safety of patients and the public, and that there might be no danger to persons living in the immediate vicinity, and that the sanitarium would be a great benefit to the general community, yet that it constituted a nuisance for the reason that there had grown into the law of nuisances an element not recognized at common law; that is, that making uncomfortable the enjoyment of another's property is a nuisance. It was there held that, though the fear of disease might be unfounded, imaginary and fanciful, yet where there is a positive dread which science has not yet been able to eliminate, such dread, robbing as it did the home owner of the pleasure in and comfortable enjoyment of his home, would make the thing dreaded an actionable nuisance, and the depreciation of the property consequent thereon would warrant a decree against its continuance. Further, that dread of disease and fear induced by the proximity of the sanitarium, if that in fact destroys the comfortable enjoyment of the property owners, is not unfounded and unreasonable when it is shared by the whole of the interested public, and property values become endangered, and that:

''The question is, not whether the fear is founded in science, but whether it exists; not whether it is imaginary, but whether it is real, in that it affects the movements and conduct of men. Such fears are actual, and must be recognized by the courts as other emotions of the human mind. . . . Comfortable enjoyment means mental quiet as well as physical comfort. . . . Nuisance is a question of degree, depending upon varying circumstances. There must be more than a tendency to injury; there must be something appreciable. The cases generally say tangible, actual, measureable, or subsisting. But in all cases, in determining whether the injury charged comes within these general terms, resort should be had to sound common sense. . . . The theories and dogmas of scientific men, though provable by scientific reference, cannot be held to be controlling unless shared by the people generally. . . The only case we find holding that fear alone will not support a decree in this class of cases is Anonymous, 3 Atk. 750. . . . Our statute modifies, if indeed it was not designed to change this rule. Under the facts, we cannot say that the dread which is the disquieting element upon which plaintiffs' complaint is made to rest, is unreal, imaginary or fanciful.''

It was held in *Goodrich v. Starrett,* 108 Wash. 437, 184 Pac. 220, that under §§ 943 and 8309 of Rem. Code (P. C. §§ 8231 and 9131-68), which define nuisance, and which add to the common law definition the new element of ''comfortable enjoyment of one's property'', that an undertaking establishment in the residential section of a city, so constructed as to affect property values in the neighborhood, is a nuisance and will be enjoined. In that case the case of *Rea v. Tacoma Mausoleum Ass'n,* 103 Wash. 429, 174 Pac. 961, 1 A. L. R. 541, referred to in the department opinion, was discussed and held not to be in conflict with the case of *Everett v. Paschall, supra.* The reference to cases from other jurisdictions which follow the common law rules on nuisance,

or statutory rules not so broad as those obtaining with us, are of very little help in solving this question.

In the case of *Hughes v. McVay*, 113 Wash. 333, 194 Pac. 565, it was held that the facts showed that the property of the persons complaining was so far away from the situation of the detention home that the fears of the complainants were based only on imagination, conjecture and uncertainty, and were the product of a fastidiousness which the law would not sanction. These cases and the cases upon which they are founded present facts which the writers of the opinions in *Goodrich v. Starrett* and *Hughes v. McVay, supra,* hold distinguish them from the situation here. In the present case, we find a very large section of the city of Seattle, composed of men and women who, in the ordinary business of life, are not to be charged as victims of hysteria, nor ready dupes of conjectural and imaginary fears, having a very real and present apprehension that their lives and properties will be jeopardized by the hanging of this modern sword of Damocles above their heads, and that fear is bolstered by the testimony of expert witnesses, and confirmed by the common sense of any one to whom the facts come. It does not take the testimony of experts, although that was produced, to advise one that the proposed structure would cause a most serious depreciation of property values within the affected area. It is an obstruction to the free use of property, as it interferes essentially with the comfortable enjoyment of life and property. It is a nuisance, for it annoys, injures and endangers the comfort, repose, health and safety of these respondents and renders them insecure in life and the use of their property. The Department opinion refers to the reservoir as a necessity, and it may be so, but there is no contention made that the necessity exists to the point where it must be erected at this particular spot and no other.

From our review of the testimony, it is clear and satisfactory to us that the injury to these respondents will be the probable effect of the action which they seek to restrain. The judgment of the lower court is affirmed.

HOVEY, BRIDGES, FULLERTON, and HOLCOMB, JJ., concur.

PARKER, C. J. (concurring)—While I concurred with the majority of Department Two upon the former hearing, further reflection has convinced me of the error of that conclusion. I am moved to concur in the result reached in the opinion of Judge Mackintosh, more because of what seems to me would be the appalling nature of the catastrophe which would result from the breaking of the proposed reservoir, than because of the probability of such break occurring. If the breaking of the proposed reservoir would probably result in comparatively small damage and no loss of life, I would not demand proof of its safety with a high degree of certainty; but in view of what now seems to me would be the appalling result of such breaking, I would want the necessity of its location there, and its safety, to be proven beyond all doubt, before withholding the injunctive relief prayed for. I think the evidence falls short of satisfying this view of judicial duty in this case. I therefore now concur in the conclusion reached by the majority opinion of the court sitting *En Banc*.

MITCHELL, J. (dissenting)—I adhere to the views expressed in the former opinion, for the reasons therein given, and therefore dissent.

MAIN and TOLMAN, JJ., concur with MITCHELL, J.