218 U.S. 113 (1910)
INTERSTATE COMMERCE COMMISSION
v.
CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY.
No. 641.
Supreme Court of United States.
Argued April 5, 6, 1910.
Decided May 31, 1910.
APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.
Mr. Wade H. Ellis and Mr. Luther M. Walter, Special Assistants to the Attorney General, with whom Mr. Edwin P. Grosvenor, Special Assistant to the Attorney General, was on the brief, for appellant.
Mr. William D. McHugh and Mr. Samuel A. Lynde for appellees.
MR. JUSTICE McKENNA delivered the opinion of the court.
This case was argued and submitted with Nos. 663 and 664, as involving the same general questions. It was disposed of in the court below with those cases in the same opinion, (171 Fed. Rep. 680,) and on the same ground, to wit, that the effect of the order of the Commission to enjoin which the suit was brought apportioned "out the country into zones tributary to given trade centers and not tributary to others," resulting in protection and favor to the first. The case is here on appeal from an order *114 granting a preliminary injunction, which was moved upon the bill (to which there was a demurrer by the Interstate Commerce Commission) and upon certain supporting affidavits.
The order enjoined was made by the Commission in a proceeding instituted before it by one George J. Kendall, in which he attacked certain rates charged by certain carriers from New York, Chicago, St. Louis, Omaha, and points taking similar rates to Denver, on the ground that the same were excessive and discriminatory, and attacked rates from Denver to Salt Lake City on similar grounds. By an amended complaint certain commodity rates were also attacked.
After hearing and argument the Commission made its report, from which the following is an extract:
"In the Burnham, Hanna, Munger Case, supra (14 I.C.C. Rep. 299), we found that the defendant carriers had for years maintained a line of proportional class rates between Chicago and the Twin Cities, applicable on traffic from the Atlantic seaboard, one-third less than their local class rates between Chicago and the Twin Cities, and that their local rates had not thereby or therefore been pulled down or reduced. We cannot accept the theory that if in this case the through rates from Chicago and St. Louis to Denver are reduced, like reductions in the local rates from Chicago or St. Louis to the Missouri River or from the Missouri River to Denver must automatically follow. If rates applicable only to through business and that are materially lower than the local rates can be maintained between Chicago and St. Paul, and in the many other instances which could be cited where the carriers adopt and maintain the same principle, without forcing reductions in the local rates, it is obvious that the same thing can be done between Chicago and the Missouri River or between Chicago and Denver. As has been seen, the class rates from the Missouri River to Denver, short *115 line distance 538 miles, are on a scale of $1.25 per 100 pounds, first class, and from Denver to Utah common points, about 650 miles, they are on a scale of $1.64 per 100 pounds, first class. Measured by any test, these rates are in both instances unreasonable and excessive. It seems obvious that they must be revised, either by voluntary action of the carriers in conformity with the principles announced in the Spokane Case, supra (15 I.C.C. Rep. 376), or in some other proceeding before this commission. For that reason no reduction of those rates will be ordered in this case, although upon the record we are convinced that they are unwarrantedly high, and that reasonable reduction therein would not work any undue reduction in the revenues of defendants. If those rates are reduced so that the combination on the Missouri River or on Denver results in reasonable through rates it does not necessarily follow that these through rates must again be reduced. Certainly it is better in every instance where important readjustment of rates is necessary to have it worked out by the carriers or with their cooperation, if that be possible.
"The present class rates from Chicago to the Missouri River are, in cents per 100 pounds, as follows:

Class .............. 1 2 3 4 5 A B C D E
Rate ............... 80 65 45 32 27 32 27 22 18 1/2 16

"The present class rates from Chicago to Denver are, in cents per 100 pounds, as follows:

Class .............. 1 2 3 4 5 A B C D E
Rate ............... 205 165 125 97 77 92 72 62 53 1/2 46

being made up of the sums of the class rates from Chicago to the Missouri River crossings, as above, and the class rates from the Missouri River to Denver, as follows:

Class .............. 1 2 3 4 5 A B C D E
Rate ............... 125 100 80 65 50 60 45 40 35 30

"The present class rates from St. Louis to Denver are, in cents per 100 pounds, as follows:

*116
Class .............. 1 2 3 4 5 A B C D E
Rate ............... 185 145 115 92 72 84 1/2 64 1/2 57 48 1/2 41

being made up of the class rates from St. Louis to the Missouri River, in cents per 100 pounds, as follows:

Class .............. 1 2 3 4 5 A B C D E
Rate ............... 60 45 35 27 22 24 1/2 19 1/2 17 13 1/2 11

and the above-named class rates from the Missouri River to Denver.
"As hereinbefore stated, we find that this rate adjustment is unjustly discriminatory in favor of the Missouri River cities and against Denver. The through class rates from Chicago to Denver and from St. Louis to Denver are unreasonably high in and of themselves. The reduction of those rates as herein ordered will not involve any unreasonable or undue reduction of the revenues of the defendants affected thereby, and for these reasons and upon the whole record we are of the opinion that for the future reasonable class rates from Chicago to Denver should not exceed, in cents per 100 pounds, the following:

Class .............. 1 2 3 4 5 A B C D E
Rate ............... 180 145 110 85 67 80 1/2 63 54 47 40

and that reasonable class rates from St. Louis to Denver should not exceed, in cents per 100 pounds, the following:

Class .............. 1 2 3 4 5 A B C D E
Rate ............... 162 127 101 80 1/2 63 74 56 50 42 36"

An order was directed to be entered in accordance with those views, which was done, and the railroads were required thereby to cease and desist, on or before the first of May, 1909, and for a period of two years, to exact for the transportation of traffic rates in excess of those above mentioned, respectively, from Chicago and St. Louis to Denver, and to establish on or before that date and maintain said rates between said cities.
The railroads affected, to wit, Chicago, Burlington and Quincy Railroad Company, the Chicago, Rock Island and Pacific Railway Company, Chicago and Northwestern *117 Railway Company, Chicago, Milwaukee and St. Paul Railway Company, the Atchison, Topeka and Santa Fe Railway Company, Missouri Pacific Railway Company, Union Pacific Railroad Company, and the Wabash Railroad Company, filed a bill to enjoin the enforcement of the order.
In their bill the companies described their respective roads and the termini of the roads, and alleged that the companies were respectively engaged as common carriers in the transportation of property by railroad by continuous carriage or shipment from and to the points designated in the report and order of the Commission. The bill alleged the relation of the carriers to one another and the extent of their roads westward and eastward and their relation to roads east of Chicago and the Mississippi River. The manner of charging and adjusting rates is described in the bill and the classifications of freight which existed as in the bill in Nos. 663 and 664.
In the bill in those cases the Mississippi River was alleged to be a basing point for freight destined to the Missouri River cities. In the case at bar the Missouri River is added as a basing point in the making of rates for the transportation of merchandise originating east of the Mississippi River, destined to territory between the rivers and to the Missouri River cities and west thereof. And it is alleged that the making of such basing points "has been due both to natural physical conditions and to the natural development of railroad construction and operation to and beyond said rivers and in territory between the same, and has naturally resulted in the evolution and development of railroad transportation, and the business and commerce in and through Western territory."
The facts which caused such result are set out at length and are in substance that railroads were built westward to certain points and that other and independent roads were constructed farther westward, each road charging its *118 separate rate, and that the places to which and from which the roads were built were natural distributing centers, "and were able to compete on the basis of equality with each other in the distribution and sale of their merchandise."
The relation of the two rivers as basing points and why the Missouri was made one is set forth in the following paragraph:
"Your orators further aver that long prior to the construction of any railroad westward across the Missouri River to the city of Denver the said Missouri River had been made a basing point in the making of rates to territory west of said Missouri River, and that, as is above stated, for many years the only railroads serving the said Missouri River cities were lines of railroads entering said cities from the east and terminating there, and lines of railroad beginning at said cities and extending west therefrom, and that at the time the said four lines of railroad of your orators, the Chicago, Burlington and Quincy Railroad Company, the Chicago, Rock Island and Pacific Railway Company, the Missouri Pacific Railway Company, and the Atchison, Topeka and Santa Fe Railway Company, were constructed west of and across the said Missouri River to the city of Denver, or other Colorado common points, the said Missouri River cities and the commercial interests therein had become extensive and important, and the competition with the railroads whose lines terminated at said Missouri River cities had become so active and the competition between the several distributing points on said Missouri River and east thereof had become so extensive and important that the said four companies whose lines were extended across said river and westward therefrom were compelled by reason of commercial and competitive conditions to recognize, adopt and apply at said Missouri River cities the said system of basing rates on the Missouri River which had always *119 theretofore obtained as hereinabove set forth." That is, as had obtained on the Mississippi River.
The other allegations supplement the above and are substantially like those which formed the basis of the contentions made and argued in the other cases.
The bill, as we have said, was supported by affidavits. They were substantially the same and set forth the acquaintance of their makers with railroad construction, development and management. They set forth with detail the facts and circumstances which their makers conceived to be determinative of the questions involved and a justification of the system of ratemaking established by the companies, and which, they averred, affected "vitally all the important lines of business of the Western country." They further averred that a change in the system, whereby the practices under it "should be forbidden, would be a change which would revolutionize the methods of doing business throughout the Western country, and would work injury to the west and its business, the extent of which would be so great as to be difficult of computation."
It will be seen, therefore, that this case and the other cases are alike except as to the points of destination of the roads and the cities that are concerned with the rates charged and reduced. This and they turn on the same question of the power of the Commission, the effect of its order on business conditions and the systems of ratemaking by the railroads, its effect upon the revenues of the companies, and by their reduction to cause a deprivation of the property of the companies without due process of law, in violation of the Fifth Amendment of the Constitution of the United States.
Further elaboration we think is unnecessary, and on the authority of cases Nos. 663 and 664 the decree of the Circuit Court is reversed and the case remanded with directions to set aside the injunction and dismiss the bill.
So ordered.