[No. 9987. *En Banc.* January 27, 1912.]

THE STATE OF WASHINGTON, *on the Relation of Edward E. Webster, Plaintiff*, v. THE SUPERIOR COURT FOR KING COUNTY *et al., Respondents.*[1]

PROHIBITION—TO COURTS—WHEN LIES—ADEQUACY OF REMEDY BY APPEAL. The remedy by appeal is inadequate, and prohibition lies to prohibit the superior court from enjoining compliance with an order of the public service commission, where the relator is subject to the penalties for disobedience to the orders of court, on the one hand, and of the order of the commission, if lawfully made, on the other, and in a position of extreme uncertainty.

CONSTITUTIONAL LAW—POLICE POWER—AUTHORITY TO FIX TELEPHONE RATES. It is within the police powers of the state to regulate telegraph and telephone rates by surrendering the control to a properly constituted commission, subject to judicial review, under art. 12 of the Const., providing for the organization of corporations and declaring telegraph and telephone companies to be common carriers subject to legislative control.

MUNICIPAL CORPORATIONS—APPLICATION OF GENERAL LAWS—CONSTITUTIONAL LAW—LEGISLATIVE POWERS—DELEGATION TO MUNICIPAL CORPORATIONS — RESTRICTIONS — SPECIAL CHARTERS—TELEPHONE COMPANIES—FRANCHISE—RATES—CONTROL. Const., art. 11, § 10, authorizing the adoption of charters by cities of the first class, which provides that the same shall be "subject to and controlled by general laws," and Id., § 11, which authorizes a city to make police regulations not in conflict with general laws, are to be construed as a reservation of a general legislative power in the state; so that a franchise granted by a city to a telegraph company under authority of a special city charter is subject to such reservation, and may be controlled or modified by subsequent acts of the legislature.

STATUTES—GENERAL LAWS—CONSTRUCTION. The public utilities act of 1911, p. 538, providing for a public service commission with power to establish reasonable rates and charges for public service corporations, is a "general law," within Const., art. 11, § 10, authorizing the adoption of special charters by cities subject to general laws; Const., art. 12, § 18, having required the legislature to establish reasonable maximum rates for railroads and other common carriers, and providing that a railroad commission may be established and its powers defined.

[1]Reported in 120 Pac. 861.

CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS — MUNICIPAL FRANCHISES — POWER OF STATE TO ABROGATE—POLICE POWER—TELEGRAPHS AND TELEPHONES—RATES. The power to fix rates being reserved by the constitution, the same is not an incident to the right of a city to frame a special charter; and there being no express grant or waiver of the constitutional reservation, a city franchise to a telephone company granted under authority of a special charter is a mere license or permission, subject to control by the police power of the state, and the obligations thereof are not binding upon the state as a contract within the meaning of the Federal constitution.

CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS—FRANCHISES— ABROGATION—PARTIES ENTITLED TO QUESTION — MUNICIPAL CORPORATIONS—TELEPHONE AND TELEGRAPHS—RATES. Where a city, in granting a franchise to a telephone company fixing maximum rates, reserved the right to alter, amend or annul the conditions of the franchise, it cannot raise the objection that the state, in raising the rates in the exercise of its police power, will impair the obligations of the contract.

TELEPHONE AND TELEGRAPH COMPANIES—SERVICE—RATES—POWER TO INCREASE—PUBLIC UTILITIES COMMISSION. Under the public utilities act of 1911, p. 538, authorizing the public service commission to fix reasonable rates and charges for public service corporations which are required to furnish adequate and sufficient services and facilities, the commission has power to require a telephone company to raise its rates above the maximum permitted by its city franchise, where such increased rate has become necessary to provide sufficient revenue to give an adequate service.

MORRIS and ELLIS, JJ., dissent.

Application filed in the supreme court November 2, 1911, for a writ of prohibition to the superior court of King county, Dykeman, J., prohibiting further proceedings in an action to enjoin compliance with an order of the public service commission respecting telephone rates. Writ granted.

*Geo. D. Emery* (*Preston & Thorgrimson,* of counsel), for relator.

*James E. Bradford* and *Howard D. Hughes,* for respondents.

*The Attorney General* and *Stephen V. Carey, Assistant,* amici curiae.

CHADWICK, J.—The Independent Telephone Company was organized in 1901, under the laws of the state of Washington. Under its general powers, and by the warrant of a franchise, it is operating a telephone system, in the city of Seattle, which has grown in volume from 3,774 service telephones in 1903, to 18,071 in 1910.   In June, 1910, a patron of the company made complaint to the then state railroad commission, alleging inefficient service on the part of the company, the charge of inefficiency being predicated upon an allegation that relator's rates were insufficient to support a proper service.   A hearing was had, and after a physical valuation of the company's property, an order was made directing the company to inaugurate a new schedule of rates which were somewhat higher than those fixed in the franchise theretofore granted by the city of Seattle.   The order of the commission became effective November 1, 1911, and was upon that day and the day thereafter put in force by the company. On the evening of the second day, the company was enjoined, at the instance of the city of Seattle, from collecting the rates fixed by the commission which, because of the act of 1911, will be hereafter referred to as the public service commission.   Thereupon relator came to this court and asked that a writ be made to run against the superior court, prohibiting it from further proceeding in defiance of the order of the public service commission.

The attorney general has filed a brief in this court, and has made oral argument in support of the contention of the relator that the state, through its public service commission, had ample and lawful power to raise the service rates of the company above the rates fixed in the ordinance granting its franchise.   A part of the relator's brief is taken up with a discussion of the question of the jurisdiction of this court. Inasmuch as relator is now in a position of extreme uncertainty, being subject to the penalties of the superior court for disobedience of its orders, on the one hand, and to a severe penalty for disobedience of the order of the commission,

if lawfully made, we think this question may be disposed of by saying, without discussion, that a remedy by appeal would be inadequate. We have, therefore, merely suggested enough to indicate that we are of opinion that we have jurisdiction under the law. Otherwise the stipulation of the parties would be ineffectual to give it to us. The city by demurrer admits that the franchise rates are inadequate; and in the interests of a speedy decision upon the main issues, it is stipulated that the sole questions to be determined by us are: (1) "Has the legislature vested in the public service .commission authority to increase the rates specified in § 7 of Ordinance, No. 6,498 of the city of Seattle and ordinances amendatory thereof, under which the company is operating," and (2) "If such power has been vested in the public service commission, whether the legislative acts assuming to grant such powers are unconstitutional and void."

Of the first proposition there can be no doubt. The police power of the state is more than an attribute of sovereignty. It, like the power of taxation, is an essential element of government, and exists in every state without express declaration and without limitation, in so far as it is made to apply to the health, peace, comfort, and morals of the people. Formerly applied strictly and directly, it has now, because of changed economic conditions, come to be more favored, and is frequently relied upon to sustain laws which but indirectly affect the common good. The most modern and perhaps the most striking application of this power is to be found in our own books (*State ex rel. Davis-Smith Co. v. Clausen*, 65 Wash. 156, 117 Pac. 1101), where this court said:

"The test of a police regulation when measured by this clause of the constitution [§ 3, art. 1,] is reasonableness, as contradistinguished from arbitrary or capricious action. . . . . There is no absolute right to do as one wills, pursue any calling one desires, or contract as one chooses . . . liberty means absence of arbitrary restraint, not immunity

from reasonable regulations and prohibitions imposed in the interests of the community."

It is unnecessary to dwell upon that case or the authorities upon which it is made to rest. "In its broadest acceptation it means the general power of the state to preserve and promote the public welfare, even at the expense of private rights." *Tacoma v. Boutelle*, 61 Wash. 434, 112 Pac. 661. The power to regulate and control the rates of common carriers has been held to be a legitimate exercise of the police power of the state. *Home Telephone Co. v. Los Angeles*, 211 U. S. 265; *Munn v. Illinois*, 94 U. S. 113; *Chicago etc. R. v. Iowa*, 94 U. S. 155.

The authority of the public service commission was, by the legislature of 1911, extended so as to include within its reach all public service corporations. Laws 1911, p. 538, § 1.

It is a settled principle of constitutional law that,

"The government which has a right to do an act, and has imposed upon it the duty of performing that act, must, according to the dictates of reason, be allowed to select the means; and those who contend that it may not select any appropriate means, that one particular mode of effecting the object is excepted, take upon themselves the burden of establishing that exception." *M'Culloch v. Maryland*, 4 Wheat. 316, 409.

See, also, *Interstate Commerce Commission v. Brimson*, 154 U. S. 447.

Under art. 12 of our state constitution, there can be no doubt of the power of the state to take cognizance of all matters affecting common carriers. Telegraph and telephone companies are made common carriers and subject to legislative control. The surrender of this control to a properly constituted commission, subject to judicial review, has been sustained as a lawful exercise of the legislative authority. *State ex rel. Oregon R. & Nav. Co. v. Railroad Commission*, 52 Wash. 17, 100 Pac. 179. In *State ex rel. Great Northern R. Co. v. Railroad Commission*, 52 Wash. 33, 100

Pac. 184,.the right to fix rates for common carriers was sustained.

The only question remaining is the all-important one of whether the rates fixed by the ordinance granting the franchise may be altered or annulled by the state under its reserved powers; or, to be more exact, its police power.   Much has been said in argument as to the power of the city; whether it had any power to fix rates in the absence of controlling legislation; or whether, granting its power, it holds it by express grant; or whether it is implied.   Under the great weight of judicial authority, it seems to be certain that a municipality exercising the delegated power of the state has no right to fix rates unless the power be express.

"It has been settled by this court that the state may authorize one of its municipal corporations to establish by an inviolable contract the rates to be charged by a public service corporation (or natural person) for a definite term, not grossly unreasonable in point of time, and that the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating the rates. *Detroit v. Detroit Citizens' St. Ry. Co.*, 184 U. S. 368, 382; *Vicksburg v. Vicksburg Water Works Co.*, 206 U. S. 496, 508.   But for the very reason that such a contract has the effect of extinguishing *pro tanto* an undoubted power of government, both its existence and the authority to make it must clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power.   *Providence Bank v. Billings*, 4 Pet. 514, 561; *Railroad Commission Cases*, 116 U. S. 307, 325; *Vicksburg &c. Railroad Co. v. Dennis*, 116 U. S. 665; *Freeport Water Co. v. Freeport City*, 180 U. S. 587, 599, 611; *Stanislaus County v. San Joaquin C. & I. Co.*, 192 U. S. 201, 211; *Metropolitan Street Ry. Co. v. New York*, 199 U. S. 1.",   *Home Telephone Co. v. Los Angeles, supra.*

See, also, *St. Louis v. Western Union Tel. Co.*, 149 U. S. 465; *Manitowoc v. Manitowoc & Northern Traction Co.*, 145 Wis. 13, 129 N. W. 925; Jones, Tel. & Tel. Companies, § 19; *St. Louis v. Bell Tel. Co.*, 96 Mo. 623, 10 S. W. 197, 9 Am. St. 370, 2 L. R. A. 278; *Chicago Gas-Light & Coke*

*Co. v. People's Gas-Light & Coke Co.*, 121 Ill. 530, 13 N. E. 169, 2 Am. St. 124; *Bluefield Waterworks & Imp. Co. v. Bluefield* (W. Va.), 70 S. E. 772, 33 L. R. A. (N. S.) 759, and note.

But, as we view this case, we may assume that the city of Seattle had lawful authority, when it passed an ordinance granting a franchise to the company, to fix its tolls.

Section 10, art. 11, of our state constitution, has played an important part in our jurisprudence. The phrase "subject to general laws," has been held to be a reservation of a general legislative power in the state, and under it many laws have been passed and many decisions pronounced holding that it was the policy of the state constitution that freeholders' charters and amendments thereto shall always be subject to the control of general laws. *Hindman v. Boyd*, 42 Wash. 17, 84 Pac. 609; *Benton v. Seattle Elec. Co.*, 50 Wash. 156, 96 Pac. 1033. To the same effect are: *In re Cloherty*, 2 Wash. 137, 27 Pac. 1064; *State ex rel. Seattle v. Carson*, 6 Wash. 250, 33 Pac. 428; *Seymour v. Tacoma*, 6 Wash. 138, 32 Pac. 1077; *State ex rel. Fawcett v. Superior Court*, 14 Wash. 604, 45 Pac. 23, 33 L. R. A. 674; *Tacoma Gas & Elec. Light Co. v. Tacoma*, 14 Wash. 288, 44 Pac. 655; *State ex rel. Navin v. Weir*, 26 Wash. 501, 67 Pac. 226.

This rule has become so firmly entrenched in our jurisprudence that it was held in *Ewing v. Seattle*, 55 Wash. 229, 104 Pac. 259, that a general law, authorizing cities to grant franchises to street railroads and to prescribe the terms and provisions thereof, superseded the charter provision of the city of Seattle requiring franchises to be sold at public auction to the highest bidder. In that case the court said:

"While our constitution has reserved to the people of cities of the class to which Seattle belongs the power to frame and adopt charters for their own government, it also provides that such charters 'shall be subject to and controlled by general laws.' And this court has repeatedly and uniformly held that where the legislature has enacted laws re-

lating to such cities, or to the powers and duties of their officers, such laws supersede charter provisions in conflict therewith. . . . It having become the settled law of this state, by the construction repeatedly placed upon the constitution, that a general law enacted by the legislature is superior to and supersedes all freehold charter provisions inconsistent therewith, it becomes plain that, when the legislature, by the Laws of 1903 and 1907, gave to the legislative authority of the cities of the state the power to grant street railway franchises, and also the power to *prescribe the terms and conditions on which such railways . . . shall be constructed, maintained and operated,*' that power cannot be limited or prescribed by freehold charter provisions."

It may be said that the public utilities act is not a general law, within the constitutional meaning of that term; that no law can be a general law unless it actually fixes a uniform rate. If it were not for § 18, art. 12, of the state constitution:

"The legislature shall pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight, and to correct abuses and to prevent discrimination and extortion in the rates of freight and passenger tariffs on the different railroads and other common carriers in the state, and shall enforce such laws by adequate penalties. A railroad and transportation commission may be established, and its powers and duties fully defined by law;"

and § 1, art. 12:

"Corporations may be formed under general laws, but shall not be created by special acts. All laws relating to corporations may be altered, amended or repealed by the legislature at any time, and all corporations doing business in this state may, as to such business, be regulated, limited, or restrained by law;"

and the construction put upon § 18 in *State ex rel. Great Northern R. Co. v. Railroad Commission*, 52 Wash. 33, 100 Pac. 184, it might be so held. In the *Great Northern* case, it was contended that the only power the legislature had was to pass a law fixing a maximum rate. But this court held,

as all other courts have come to hold, that the power to fix rates does not necessarily compel the legislature to make, by a general law, a just rate which is uniform. This contention was expressly overruled in that case. Rates cannot be arbitrarily fixed, but must be determined with reference to the conditions existing where they are to be put into execution. Manifestly a legislature could not, by special acts, fix these rates. The only practical method was—and it seems to have been foreseen by the makers of the constitution—to create a commission with power to ascertain what rate would be just and reasonable in each particular case, and to prescribe and enforce the same. *Interstate Commerce Commission v. Chicago etc. R. Co.*, 218 U. S. 88; *Interstate Commerce Commission v. Chicago etc. R. Co.*, 218 U. S. 113. The power thus exercised by the commission is not a usurpation of legislative and judicial functions, nor does it unite in one body conflicting governmental authority. It consists simply in the ascertainment of facts upon which the general rule of the legislative body, and of the constitution prescribing that reasonable rates shall be adopted, operates. *Railroad Commission Cases*, 116 U. S. 307; *Reagan v. Farmers Loan & Trust Co.*, 154 U. S. 362.

It having been heretofore held that the constitutional power can be exercised through a commission with power to fix rates, and that the public is not bound to pass a general law fixing maximum rates, it follows that the public utilities act is a "general law," and under many decisions of this court, supersedes any ordinance or charter provision of any city which may conflict therewith. The power to fix rates is a mere detail in the execution of the general law, and cannot be insisted upon as the essential letter of the law. *State ex rel. Great Northern R. Co. v. Railroad Commission*, 52 Wash. 33, 100 Pac. 184; *Field v. Clark*, 143 U. S. 649; *Buttfield v. Stranahan*, 192 U. S. 470; *Union Bridge Co. v. United States*, 204 U. S. 364.

It may seem that, when applied to particular instances,

the law putting power to fix a schedule of rates in a legislative board infringes some supposed right that might well have been exempted from its operation. But that consideration is for the legislature and not for the courts. We have no power to negative the will of the legislature because we do not like a law. Within the limits of its constitutional warrant, the legislature is supreme; cities and towns are the creatures of, and subordinate to, its will; and for us to hold the public utilities act obnoxious to the constitution, or as offensive to our own notions of governmental policy, would make this court the law-making body, in defiance of the will of the people to enact their own laws in legislative assemblies duly convened. The people, not only of this state, but generally in other states, have gone beyond the original conceptions of local self-government; and to sustain and make practical needed reforms, have had to fall back upon the police power of the state as declared by laws general in their application. This rule in many states is the result of judicial construction, but our people left no room for construction. Section 11, art. 11, state constitution, is a positive declaration.

"Any county, city, town, or township, may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws."

This section is subject to the same interpretation as § 10, and under it a general law becomes controlling. The words "not in conflict with general laws," as there employed, do not mean that municipal regulations passed in the absence of general laws foreclose the right of the state to assert its sovereignty, but merely that the police power may be exercised until such time as the state acts. They must then give way to the general law. If, by its inaction, the state has permitted a municipality to assume and exercise its police power, it is not foreclosed of its right, if the legislature afterwards sees fit to exercise it. Cooley, Const. Lim. (7th ed.), p. 279. Under this rule, concurrent jurisdiction

over crimes has been sustained.    But where the state, as has
this state, asserted its jurisdiction over a given subject-mat-
ter, and there is no room for concurrence, the municipal
charter or ordinance must give way.    Dillon, Mun. Corp.
(5th ed.), 631.

The same question now confronting us was before the su-
preme court of Wisconsin.    A city had granted permission
to a railway company to run interurban cars over and along
its streets.    One of the conditions upon which the right was
given was that the fare to be charged between the two cities
should not exceed ten cents for a single trip during the life
of the franchise, which was thirty-five years.    The franchise
was accepted and acted upon.    Thereafter the company to
which the franchise had been assigned announced that the
rate would be increased to fifteen cents.    The city brought
suit to prevent the increase in fares, and to compel the com-
pany to abide by its contract.    The company set up as de-
fenses that the city had no power to exact the condition;
that the ordinance, in so far as it related to interurban
fares, was *ultra vires;* that the ordinance had been super-
seded and repealed by subsequent legislative action; that a
fare of ten cents was not compensatory, and that one of fif-
teen cents was reasonable.    The trial court found that a ten-
cent fare was not compensatory, and that a fifteen-cent fare
was reasonable, but that the company was bound by the terms
of the ordinance, and enjoined it from raising the rate.    The
supreme court reduced the questions involved to three:    (1)
Did the parties have the power to make a contract?    (2)
if so, to what extent is it binding and enforceable?    (3)
had it been lawfully superseded or nullified?    And now,
adopting the language of the court:

"(1)    That the traction company had the right on its
part to make a contract fixing the rate of charge for a given
service, provided such contract violated no law and was not
inimical to public policy, is clear enough.    By so doing it
could not forestall the state and prevent it from exercising
its governmental function regulating rates.    But until the

state sees fit to interpose, the carrier ordinarily may exercise a free hand in fixing rates, subject to the qualification that they must not be unreasonably high and must not be unjustly discriminatory. . . . There was no law inhibiting the making of the contract involved, at the time it was entered into, and there is nothing to show that it was discriminatory or against public policy. . . . We therefore hold that the parties were competent to make the contract entered into."

(2) It was held that no special authority had been conferred on the city to enter into the contract and,

"The contract remained valid between the parties to it until such time as the state saw fit to exercise its paramount authority, and no longer. To this extent, and to this extent only, is the contract before us a valid subsisting obligation."

(3) A public service law enacted in 1905, somewhat similar to our own, was next considered by the court.

"By that statute (sec. 3) it is provided that all charges made by any carrier coming under its provisions 'shall be reasonable and just, and every · unjust and unreasonable charge for such service is prohibited and declared to be unlawful.' Railway companies are required to file their tariffs with the railroad commission and are prohibited from making changes therein except on ten days' notice, and the rates fixed in such tariffs are declared to be the lawful rates until changed as provided by the act. Sec. 12 of the law provides that the commission may, on complaint or on its own motion, proceed to determine the reasonableness of any rate, and, whenever such rate is found to be unreasonable, may fix and determine what a reasonable charge shall be, and thereupon the rate so fixed shall be the lawful rate. By subd. 'c' of sec. 12 a railway company is given the same right to make complaint that is given to any other person or corporation. It is contended that this law had superseded the contract involved in this suit and that therefore the contract no longer has any binding force or effect. We do not think so. The statute worked no change in existing rates. It simply provided that all rates should be reasonable, and left to the railroad commission the power to determine the fact as to whether

or not a given rate was reasonable. When that determination was reached the law became operative upon the particular rate called in question and the rate arrived at then became the lawful rate and continued so until set aside in the manner provided by the law. The railroad commission has made no determination in the case before us; at least, if it has, it is no part of the record. Until that determination is made the contract is in force. When it is made the contract is superseded, if the rate is changed. The commission has ample authority to proceed upon its own motion. The traction company, under subd. 'c' of sec. 12, has power to make the necessary complaint to .compel an investigation. This works no hardship on any one. It may be, as the trial court found, that a ten-cent fare is unreasonable and that a fifteen-cent fare is not so. Usually, long-time contracts made under like conditions operate against the public interest, and, if the fare provided for is unreasonably low, the legislature has the same power over it that it would have if it were unreasonably high. It may also be that adequate service cannot be given at the rate fixed or that conditions have so changed that the road cannot be operated unless rates are increased and that the public will be better served by raising the rate than by permitting it to remain where it is. This is a question which calls for the exercise of legislative policy and discretion. The court cannot relieve the defendant from an improvident contract, but the contract is of such a character in the present instance that the legislative branch of the government may, in the interest of the public, abrogate it." *Manitowoc v. Manitowoc & Northern Traction Co.*, 145 Wis. 13, 129 N. W. 925.

The same principles are affirmed in *Home Telephone Co. v. Los Angeles*, 211 U. S. 265, and *Dawson v. Dawson Tel. Co.* (Ga.), 72 S. E. 508. Notwithstanding it is earnestly contended on behalf of the city that the contract is inviolable, and cannot be abrogated under the contract clause of the Federal constitution. Counsel relies mainly upon the case of *Cleveland v. Cleveland City R. Co.,* 194 U. S. 517, and its kindred cases: *Vicksburg v. Vicksburg Waterworks Co.*, 206 U. S. 496; *Walla Walla City v. Walla Walla Water Co.*, 172 U. S. 1; *Walla Walla Water Co. v.*

*Walla Walla*, 60 Fed. 957; *Cleveland v. Cleveland Elec. R. Co.*, 201 U. S. 529; *Detroit v. Detroit Citizens' St. R. Co.*, 184 U. S. 368; *State ex rel. Dennison v. Seattle R. & S. R. Co.*, 64 Wash. 167, 116 Pac. 638; *State ex rel. Linhoff v. Seattle, Renton & Southern Co.*, 62 Wash. 124, 113 Pac. 260; *City of Noblesville v. Noblesville Gas & Imp. Co.*, 157 Ind. 162, 60 N. E. 1032; *People v. Barnard*, 110 N. Y. 548, 18 N. E. 354; *Selectmen of Clinton v. Worcester R. Co.*, 199 Mass. 279, 85 N. E. 507; *Galveston & W. R. Co. v. Galveston*, 90 Tex. 398, 39 S. W. 96, 36 L. R. A. 33; *City of Detroit v. Ft. Wayne & B. I. R. Co.*, 95 Mich. 456, 54 N. W. 958, 35 Am. St. 580, 20 L. R. A. 79; *Omaha Water Co. v. Omaha*, 147 Fed. 1.

Our answer to this contention is that each of these cases is based upon one of two premises; either, as said in the *Cleveland* case, the authority conferred upon the city was "express and unmistakable;" or the controversy was between the city and its franchisee, the state being in no sense a party and having no interest in the result of the litigation. Where the state is a party, and it appears that there has been no express grant or waiver of its constitutional right to fix rates so as to give an ordinance the force of a contract binding upon the state (granting that under our constitution this could be done), it cannot be held, as a matter of either law or policy, that a franchise such as the one now under consideration is a contract binding upon the state of Washington; and for several reasons.

The power to fix rates, being a right reserved by the people of the state, cannot, in the light of the constitution, be held to be an incident to the right to frame a freeholders charter. *State ex rel. Garner v. Missouri & K. Tel. Co.*, 189 Mo. 83, 88 S. W. 41. Such contracts, when entered into without express legislative authority, are permissive only, and subject to the exercise of the sovereign power of the state, and do not partake of the quality of contracts as that term is employed in the contract clause of the Federal

constitution.  Instances of a contract valid between parties, but held to be abrogated by the subsequent exercise of the police power of the state were treated in *Louisville & N. R. Co. v. Mottley*, 219 U. S. 467, and in *Chicago, I. & L. R. Co. v. United States*, 219 U. S. 486 (the free pass decisions). In the *Mottley* case it was contended that:

"Congress has vast power.  It is a potent arm of the government, but it is not omnipotent.  When a private citizen has made a lawful contract, has executed that contract fully so far as his obligation is concerned, and has parted with his money or property on the faith of the inviolability of his contract, that contract cannot be confiscated, simply because Congress has power to regulate commerce between the states."

Justice Harlan, speaking for the whole court, met this contention, saying:

"The agreement between the railroad company and the Mottleys must necessarily be regarded as having been made subject to the possibility that, at some future time, Congress might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable or to impair its value.  That the exercise of such power may be hampered or restricted to any extent by contracts previously made between individuals or corporations, is inconceivable.  The framers of the constitution never intended any such state of things to exist."

He then quoted from jurists and textwriters as follows:

"That no contract can be carried into effect, which was originally made contrary to the provisions of the law, or which being made consistently with the rules of law at the time, has become illegal in virtue of some subsequent law, are propositions which admit of no doubt."  Lord Ellenborough, *Atkinson v. Ritchie,* 10 East. 530.

"If the legislature had no power to alter its police laws when contracts would be affected, then the most important and valuable reforms might be precluded by the simple device of entering into contracts for the purpose.  No doctrine to that effect would be even plausible, much less sound and

tenable." Judge Cooley, *Kentucky etc. Bridge Co. v. Louisville & N. R. Co.*, 34 Am. & Eng. R. Cases, 630.

"If one agrees to do a thing which it is lawful for him to do, and it becomes unlawful by an act of the legislature, the act avoids the promise." Parsons, Contracts (6th ed), 675.

Judge Harlan, continuing, says:

"We forbear any further citation of authorities. They are numerous and are all one way. They support the view that, as the contract in question would have been illegal if made after the passage of the commerce act, it cannot now be enforced against the railroad company, even though valid when made. If that principle be not sound, the result would be that individuals and corporations could, by contracts between themselves, in anticipation of legislation, render of no avail the exercise by Congress, to the full extent authorized by the constitution, of its power to regulate commerce. No power of Congress can be thus restricted. The mischiefs that would result from a different interpretation of the constitution will be readily perceived."

If originally the power of the state of Washington to fix and control rates and tolls for common carriers was more doubtful than the power of Congress to legislate upon the subject-matter of interstate commerce, upon which we rely to sustain our argument, that doubt was entirely removed by the railroad cases decided by this court and to which we have referred. *State ex rel. Oregon R. & Nav. Co. v. Railroad Commission*, 52 Wash. 17, 100 Pac. 179; *State ex rel. Great Northern R. Co. v. Railroad Commission*, 52 Wash. 33, 100 Pac. 184.

"The same conclusion is reached in respect to the legislative control over contracts which a corporation may make with individuals. Such contracts are ever subject to the future exercise of the police power, in the promotion of the public welfare. This is particularly true in the case of *quasi* public corporations, such as railroads." Tiedeman, State & Federal Control, p. 961.

See, also, *Chicago etc. R. Co. v. Nebraska*, 170 U. S. 57; Jones, Tel. & Tel. Companies, § 214; *Portland R. Light &*

*Power Co. v. Railroad Commission,* 56 Ore. 468, 105 Pac. 709, 109 Pac. 273; *Southern Wire Co. v. St. Louis Bridge etc. Co.,* 38 Mo. App. 191.

"The granting of a franchise to a telephone company by an ordinance passed by the municipal authorities of a city, wherein it is provided that the company 'agrees and binds itself by this ordinance that the rates charged shall be $1.50 per month for residence phones and $2.50 per month for business phones,' and an acceptance of such franchise by the company, does not prevent the telephone company from increasing such charges, if permission to do so is subsequently granted it by the railroad commission, especially as it appears that the city was not specifically authorized by its charter, or other legislative enactment, to fix the charges to be made by telephone companies. . . . The order of the railroad commission does not violate the provisions of the state and Federal constitutions prohibiting the impairment of the obligations of contracts." *Dawson v. Dawson Tel. Co.* (Ga.), 72 S. E. 508.

"No government can advance in civilization, in wealth, and in influence without an enforcement of these [police] powers. When any corporation acquires a franchise for the purpose of carrying on a corporate business within a state, it is accepted subject to the police power. By giving the franchise (we may say, permitting it to be exercised) the state did not abrogate its power over the public highways; nor in any way curtail its power to be exercised for the general welfare of the people; . . . Neither can this power be alienated, surrendered, nor abridged by the legislature by any grant, contract, or delegation whatsoever; because it constitutes the exercise of a governmental function without which it would become powerless to do those things which it was specially designed to accomplish." Jones, Telegraph & Telephone Companies, § 214.

"No doubt the agreement of 1886 constituted a contract, in such a sense that the respective parties thereto continued to be bound by its provisions so long as the legislation, in virtue of which it was entered into, remained unchanged. While the agreement lasted its provisions defined the rights and duties of the city and the railroad companies. But was it a contract whose continuance and operation could not

be affected or controlled by subsequent legislation? Usually, where a contract, not contrary to public policy, has been entered into between parties competent to contract, it is not within the power of either party to withdraw from its terms without the consent of the other; and the obligation of such a contract is constitutionally protected from hostile legislation. Where, however, the respective parties are not private persons, dealing with matters and things in which the public has no concern, but are persons or corporations whose rights and powers were created for public purposes, by legislative acts, and where the subject-matter of the contract is one which affects the safety and welfare of the public, other principles apply. Contracts of the latter description are held to be within the supervising power and control of the legislature when exercised to protect the public safety, health and morals, and that clause of the Federal constitution which protects contracts from legislative action cannot in every case be successfully invoked. The presumption is that when such contracts are entered into it is with the knowledge that parties cannot, by making agreements on subjects involving the rights of the public, withdraw such subjects from the police power of the legislature. . . . Any other view involves the proposition that it is competent for the city and the railroad company, by entering into an agreement between themselves, to withdraw the subject from the reach of the police power, and to substitute their views of the public necessities for those of the legislature." *Chicago, B. & Q. R. Co. v. Nebraska ex rel. Omaha,* 170 U. S. 57, 71.

The supreme court of Oklahoma has held, in *South McAlester-Eufaula Tel. Co. v. State ex rel. Baker-Reidt Merc. Co.,* 25 Okl. 524, 106 Pac. 962, that municipal corporations in that state have no power to fix rates, and that a grant of a franchise conferred no rights save the mere naked permission of the town to the defendants to enter upon the streets and alleys and erect their poles and wires. While this ruling was made upon the statutes and ordinances there in force, the principle applies in this case; for the court found that, where a contract was made in contravention of the power of the state to act over a given subject-matter, an essential element of a contract was wanting; that there was

nothing conferred upon the company or reserved by the municipality that the law would regard as a consideration, either valuable or good. Or, as we have said elsewhere in this opinion, the sovereign power of the state cannot be made the subject of a contract so as to defeat the declared right of the people of the whole state to reserve that power to themselves and to put its execution in the hand of the particular agency designated by them in their written constitution.

The power to fix rates, if exercised by a city, unless that power is clearly expressed by legislative grant, is in the nature of a license, and is revocable at the will of the legislature when, in its judgment, the common good demands its reassertion. The state does not act by contract, but by grant, license, or reservation. It is not usually bound by the contracts of others when exercising its police power. So jealous is it of the sovereignty of its police power that, in the case of the *Home Tel. Co. v. Los Angeles*, the supreme court of the United States held that a grant by the legislature of the state of the right "to fix and determine charges for telephone, telephone service, and connections," did not carry with it the right to *agree* upon rates. In other words, as that court and others have universally held, the delegation of power must be "clear and unmistakable." In dealing with the sovereign power of the people, nothing can be left to inference. The court accordingly said that the power to fix and determine rates being within the police power, the city might *establish* rates, but that it could not, under the delegation quoted, *contract* so as to bind itself or the other party as against the exercise of the police power. In principle its holding could not have been otherwise, for the strength of the police power lies in the fact that it is not a subject of contract; that it cannot be bartered or bargained away.

Reduced to its lowest terms, the contention of the city is, not that it exercised a delegated power, but that it acted at a time when there was no prohibition on the part of the state;

and that this being so, the city acted as an *imperium in imperio*, with power to determine the rates to be charged and the time for the contract to run; and that having so acted, vested rights of contract and property have attached to the franchise, which the legislature could not thereafter bar or abrogate. These contentions would be meritorious if applied to contracts involving merely private interests, but can have no application where the interests of the state are involved. A similar argument was made in the case of *Chicago etc. R. Co. v. Iowa*, 94 U. S. 155, where it was held, in response to the contention that a subsequent act of the legislature regulating freight rates impaired the obligations of contract between the state and the company, as well as the contracts of the company with its stockholders, bondholders, and mortgagees.

"It is a matter of no importance that the power of regulation now under consideration was not exercised for more than twenty years after this company was organized. A power of government which actually exists is not lost by nonuser. A good government never puts forth its extraordinary powers, except under circumstances which require it. That government is the best which, while performing all its duties, interferes the least with the lawful pursuits of its people. In 1691, during the third year of the reign of William and Mary, Parliament provided for the regulation of the rates of charges by common carriers. This statute remained in force with some amendment, until 1827, when it was repealed, and it has never been re-enacted. No one supposes that the power to restore its provisions has been lost. A change of circumstances seemed to render such a regulation no longer necessary, and it was abandoned for the time. The power was not surrendered. That remains for future exercise, when required. So here, the power of regulation existed from the beginning, but it was not exercised until in the judgment of the body politic the condition of things was such as to render it necessary for the common good. Neither does it affect the case that before the power was exercised the company had pledged its income as security for the payment of debts incurred, and had leased its road to a tenant that relied

upon the earnings for the means of paying the agreed rent. The company could not grant or pledge more than it had to give. After the pledge and after the lease the property remained within the jurisdiction of the state, and continued subject to the same governmental powers that existed before."

Without exception, courts have, in the absence of positive limitation, upheld the authority of the state as against municipal corporations when dealing with the problems of public service, and have been careful to warn against the danger of admitting a divided authority either to contract or control.

In the recent case of *Troy v. United Traction Co.,* 202 N. Y. 333, 95 N. E. 759, it is said:

"The public service commission was established, among other things, for the purpose of promoting uniformity and consistency in authoritative directions to be given to public service corporations and to constitute a tribunal trained to consider and determine controversies and problems relating to such corporations and to direct and supervise their relations to and dealings with the public as their patrons. A construction of the Public Service Commissions Law that would permit any municipality to disregard and set at naught the orders of the public service commission in cases like the one now before us would not only cause confusion of authority but would make of no effect some of the work of the commission for the doing of which it was established."

There is another reason for the issuance of the writ which suggests itself to us as of possible worth, and that is, whether the city can raise the question of impairment of its contract. The city, it would seem, is in no position to assert this principle, for the state is doing only what it (the city) reserved the right to do—to alter, amend, or annul the conditions of the franchise; that is, it is exercising the police power, but whether the power be wholly in the state or held to be concurrent, as is generally held in the matter of nuisances and minor crimes, the city should not be heard to raise the question, and the other party to the contract does not.

We might multiply authorities to sustain these proposi-

tions, but it would unnecessarily extend the limit of this opinion, for as said by Justice Harlan, they are all one way. But it would seem that in principle we could not do otherwise than sustain the powers of the public service commission as they have been defined by the legislature. Laws of this character mark the practical solution of those problems which have beset the people since private interest, operating not locally but generally throughout the state or nation, have become the almoners of public necessities in so far as these necessities touch public service—transportation, light, power, and kindred subjects. Rich fields of investment have been opened up. Watered stock and stock dividends have concealed the true amount of the investment as well as what would be a fair return upon the actual capital employed, from those who were not called upon merely, but forced, to bear the burden of sustenance.

"Neither is it a matter of any moment that no precedent can be found for a statute precisely like this. It is conceded that the business is one of recent origin, that its growth has been rapid, and that it is already of great importance. And it must also be conceded that it is a business in which the whole public has a direct and positive interest. It presents, therefore, a case for the application of a long-known and well-established principle in social science, and this statute simply extends the law so as to meet this new development of commercial progress." *Munn v. Illinois*, 94 U. S. 113.

In its search for remedies and while seriously considering municipal, state, or government ownership, the public, by reference to the police power of the state, has almost unwittingly—unwittingly in the sense that it is not generally appreciated—solved the problem, and has, by the application of fundamental as well as established relative propositions of law, gained every advantage of ownership without assuming its burdens. From the time it was held to be within the police power of the state to control public service corporations to the extent of fixing rates, the natural sequences of that holding have followed with a rapidity which may seem, to

those who have been wedded to the theory that the government could not interfere in the use, or limit the earnings, of property devoted to public service and which was not put to an unlawful use, to be alarming.  With the power to fix rates established, the process of elimination of unjust rates became a mere matter of detail, based upon mathematical calculation, the only question giving any ground for debate being the basis of calculation.  Primarily, as well as logically, the basis for fixing rates for the use of property devoted to a public use is its real value; not its value as returned by those who own or control it, but a fair value fixed by the agents of the state; and, after due allowance for depreciation and upkeep as well as legitimate cost of operation, a rate that will afford a fair interest return on the investment.

Bearing in mind the interest of the public in public service corporations—an interest born of necessity—the justice and sound reasoning of these premises will not be gainsaid or denied.  But from the statement of every proposition there must follow in logic its corollary.  If we assume the right to lower rates to make the return conform to a fair interest rate upon a fair valuation, it follows that we must, in conscience, yield the right to those affected to petition for a rate, though it be higher than a present one, that will accomplish the purpose of the law.  These principles have their foundations laid deep in the doctrine of common honesty between man and man—between the public and its servants.  They are sustained upon the theory that the public is willing to pay a full return and no more, a fair return and no less, to those who have lent their capital for its benefit.  Such laws, being honest in their purpose and honestly applied, are within the meaning of the term "general law," as used in our constitution; for the great aim and object of the law is to balance the scales of justice between all who seek its light and protection.  Nor does it follow that, because there may be instances when those to whom the law has intrusted the respon-

sibility of finding the facts ordain or decree that a rate for service be raised, the common good is not served. It may work hardship to the few, but the working of the general law will in the end surely promote the good of the many. Under these statutes, efficiency has been, and will continue to be maintained. While rivalry may be promoted, monopoly in the sense of oppression is made impossible. The benefit of ownership is enjoyed, while its dangers—not the least of which is the political activities of great armies of public employees—are no longer a menace to those who, to avoid the hazards of public ownership, have unwillingly subscribed to the conditions prevailing before this and other states entered upon the policy of public control. To hold that the public service commission is without jurisdiction to raise rates to the point of fairness, as it finds that point to be, would deprive the commission of the right to lower rates. To dissent from these views would be to hold that the state could not relieve the people of a municipality of an improvident contract, or one entered into in defiance of the will of the people, instances of which might be easily multiplied were we called upon to do so.

It should be understood that we are not passing upon the fairness of the new rate. Its fairness is admitted by counsel for the city. We are dealing only with the power of the state to control those properties which exist by its authority, and the attending question whether these powers may, by inaction, be so surrendered as to estop the state from subsequently asserting them.

For the reasons assigned, it is ordered that the writ issue.

DUNBAR, C. J., FULLERTON, PARKER, GOSE, MOUNT, and CROW, JJ., concur.

MORRIS, J. (dissenting)—Not being able to concur in the views of the majority, I dissent; and as the question is an important one and its principles, if adhered to, determinative of rights of cities of the first class contrary to my conception

of the correct interpretation of our constitution, I desire in a general way to express my reasons for such dissent.

I cannot read § 10, art. 11, of the constitution, permitting cities of the first class to frame a charter for their own government, consistent with and subject to the constitution and laws of the state, without reaching the conclusion that it was the intention of the framers of the constitution to invest cities of the first class with the fullest powers of local self-government, intending that within itself the city should be supreme; the only limitation being that the power it sought to exercise should be "consistent with and subject to the constitution and laws of this state." The only reasonable and sensible construction of this limitation, in view of the power sought to be conferred, is that, while the state was yielding to the city the power to exercise local self-government in all matters purely municipal in their character, the city must recognize the constitution as the supreme authority of the state and pass no law under its power of local self-government which would exempt its citizens from obedience to the general laws of the state. In other words, the state said to the city: "So long as you confine yourselves to matters purely municipal in their nature, you may frame your own government. In all other matters, in common with all citizens of the state, you must yield to the constitution and general laws." The state, in exercising its power of general legislation for the benefit of all its citizens, reserved the power to control and govern the citizen within the city as it did the citizen without the city, to the effect that, in the exercise of its general power of government over the citizens, its laws should be uniform. The franchise under which the telephone company exercises its right within the city of Seattle was obtained from the city. Its right to be a corporation and exercise certain powers included within its charter or its franchise "to be" it derived from the state, but the right to exercise those granted powers within the city of Seattle in the manner and to the extent it sought to exercise them it

obtained from the city under its franchise "to do." The franchise from the state and the powers therein conferred were not self-executing within cities of the first class. The legal exercise of those powers could be obtained, and obtained only, from the city under proper municipal franchise and regulation, and unless there is in that franchise some grant of power or regulation inconsistent with or in conflict with the constitution and laws of this state, the state must recognize it as a valid franchise and give effect to all its provisions.

I concede that the state cannot divest itself of its police power, and that once having delegated that power, it may again assume it and exercise it through legislative enactments. But this concession does not establish the right of the public utilities commission to exercise powers granted by the constitution to cities. Under this concession, if the city should pass an ordinance in the exercise of its police power and the state should subsequently enact a law upon the same subject, the ordinance must yield to the extent of the conflict. But this is not the situation confronting us. Under its constitutional authority, the city has granted a franchise fixing rates to be charged for telephones, there is no provision of the constitution and no general law in conflict therewith. Subsequently the state created a commission to whom it delegated certain powers. In the exercise of these powers, this commission invalidates the franchise granted by the city; for if it can change that franchise in one particular, it may change it in all particulars, and thus eventually usurp every function of municipal government. I cannot consent that this may be done, nor can I yield to the announcement of any principle which holds that a commission created by and deriving its powers from the legislature can control and exercise higher powers than a city, created by and deriving its powers from the constitution. To so hold is to hold that the legislature is the supreme power of the state. I had always understood that the constitution was the supreme power of the state, to which the legislative and all other departments

of the state government must yield. The rule of the majority, if carried to its logical conclusion, means at any time the legislature may so determine, it can establish a commission, exercising every function of municipal government, and deprive all cities of this state of their constitutional birthright; a situation so abhorrent to my mind that I cannot permit its announcement without an expression of dissent.

The purpose of this constitutional provision was undoubtedly the conception that the cities could best rule themselves because they best knew their own needs and the best method to fully supply those needs so as to measure up to the greatest good of its citizens. As now written, the legislators from the rural sections of the state, without experience in the vexing and complicated problems of municipal government, may, because they are in the majority in the legislature, change the whole conception and plan of municipal government as formulated out of the experience of the dweller in the city. This to my mind was the very evil the constitution sought to guard against. If the rule of the majority be the law, our constitution-created municipalities have now no greater power, and stand in no different light, from like municipalities in those states where cities are created by special or general laws, subject at all times to legislative control, notwithstanding the expression of such a strong constitutional intent to place them upon a higher plane. And this is to be done, not by the legislature itself under the guise of some general or special law, but under a delegation of power to a subordinate commission. If the legislature may do this in one phase of constitutional authority, it may do it in another, and thus the legislature becomes in all respects, as by this decision it does in municipal matters, the constitution of the state. Surely it was intended by the language of our constitution relative to cities of the first class that they should stand upon a different plane from those of a lower class, organized and controlled by general law. Yet if this decision be the law, I should like to have the distinction

pointed out and the plane bounded, as I can see no distinction between the city of the first class exercising its powers under express constitutional authority, and the cities of the second, third, and fourth classes, created by general law, if all alike are to be subject in all things to legislative control. In the cases from this state, cited by the majority in support of their position, some general statutory provision has been found conflicting with the ordinance or charter provision there under discussion. As is said in *Ewing v. Seattle*, 55 Wash. 229, 104 Pac. 259, the last expression of this court, relied upon by the majority:

"This court has repeatedly and uniformly held that where the legislature has enacted laws relating to such cities, or to the powers and duties of their officers, such laws supersede charter provisions in conflict therewith."

I can readily admit at the outset of this dissent, that the charter or ordinances must yield to the general law; but as I view it, there is here no general law on the same subject that conflicts with this franchise. All there is, and all that can be claimed there is, is an attempt on the part of the legislature to creat a subordinate branch of the state government, invested with a power to inquire into the reasonableness of the rates of public service corporations. If the legislature should pass a law fixing a maximum and minimum rate, then the cases cited by the majority would be in point. It has, however, not attempted to do so. Nowhere in the law can there be found any expression in conflict with what the city of Seattle has done under its grant of franchise to this telephone company; and until such a law can be found, I must protest against any subordinate branch of the state government exercising powers within cities of the first class that by the constitution have been conferred on the cities themselves. To magnify an order of the public service commission into a law of the state within the meaning of this constitutional phrase is, to my mind, beyond the power of

courts or legislatures.   The constitution cannot thus be amended nor its express provisions abrogated.

Much is said in the main opinion that full control of public service corporations is within the police power of the state, and that the surrender of this control to a properly constituted commission, subject to a judicial review, is a lawful exercise of legislative authority.   As an abstract legal proposition, that may be readily admitted; but as is said by Peckham, J., in *People v. Gillson*, 109 N. Y. 389, 400, 17 N. E. 343, 4 Am. St. 465, the police power is not above the constitution, but is bounded by its provisions, and when any right or franchise is expressly protected by any constitutional provision, it cannot be destroyed nor its validity impaired by the legislature under any valid exercise of the police power. To my mind, this is the fundamental principle here involved.

For these reasons, I dissent.

ELLIS, J., concurs with MORRIS, J.